JAMES P. DUGAN, PLAINTIFF-APPELLANT, v. ROSALEEN M.
DUGAN, DEFENDANT-RESPONDENT.

Argued October 26, 1982—Decided February 28, 1983.

424

*James C. Orr* argued the cause for appellant (*Lum, Biunno & Tompkins,* attorneys).

*James P. Yudes* argued the cause for respondent.

The opinion of the Court was delivered by

SCHREIBER, J.

This case involves the equitable distribution of marital property upon divorce, more particularly the evaluation of an attorney's goodwill in his exclusively owned professional corporation.

Plaintiff, James P. Dugan, and defendant, Rosaleen M. Dugan, were married in 1958 and separated in 1978. They had no children. The plaintiff, a member of the New Jersey Bar, carries on his practice as a professional corporation. The defendant had served as a secretary in plaintiff's law office and attended college during the marriage, graduating in 1972. She is certified as a public school teacher, but as of the date of the divorce judgment was unemployed.

The judgment entered for dual no-fault divorce provided for distribution of property, alimony and other relief. Plaintiff appealed from portions of the judgment relating to the assets of the marital estate, alimony, and counsel fees. The Appellate Division affirmed. Plaintiff filed a notice of appeal and a petition for certification. We dismissed the appeal and granted plaintiff's petition for certification, limited to the issues arising

from the valuation of plaintiff's interest in his wholly-owned professional corporation. 89 *N.J.* 405 (1982). The trial court determined that the value of the material part of the marital estate was $606,966 as of December 29, 1978, the date the complaint was filed. It awarded the defendant $230,864 and the plaintiff $376,102 consisting of the following:

| | | |
|---|---|---|
| Real property | | $285,400 |
| Law practice | | |
|     Goodwill | $182,725 | |
|     Accounts receivable | 18,891 | |
|     Pension plan | 50,500 | |
|     Common stock | 1,000 | |
|       Less | | |
|       Retained earnings deficit | 1,780 | |
| Net value of law practice | | 251,336 [1] |
| Cash | | 55,313 |
| Miscellaneous | | 14,917 |
| | | $606,966 |

A major asset in the joint estate was the plaintiff's law practice. It comprised more than 40% of the entire estate and over 70% of the value of that asset consisted of the value placed on goodwill. The trial court's methodology in calculating that value was predicated on the theory that the plaintiff was to be compared with the typical incorporated attorney whose gross *assets* were roughly equivalent to the plaintiff's. The comparison was limited to the efficiency of the respective operations, that is, the percentage that net income before income taxes bears to gross receipts. The net income of a typical attorney was found to be 38.5% of gross receipts. Plaintiff's gross income

---

[1] A primary source of information concerning the corporation's assets and liabilities was its federal income tax return. The balance sheet in that return did not reflect goodwill, accounts receivable or the pension plan.

was multiplied by 38.5%, yielding what could be termed a typical attorney's net income based on plaintiff's actual gross revenues. The excess of plaintiff's net income over that resulting from the application of the 38.5% standard was then multiplied by a factor of five. The trial court found that this figure equaled goodwill.

We must determine whether goodwill is a part of the value of plaintiff's law practice; if so, whether it constitutes property subject to equitable distribution; and, if so, how it is to be evaluated.

I

In a divorce judgment a court may "effectuate an equitable distribution of the property, both real and personal," acquired during the marriage. *N.J.S.A.* 2A:34–23.[2] We have acknowledged that the Legislature intended that its reference to "property" be construed comprehensively. *Painter v. Painter,* 65 *N.J.* 196, 217 (1974); *see Gauger v. Gauger,* 73 *N.J.* 538, 544 (1977). Determining the "property" subject to equitable distribution requires a marshalling of the parties' economic resources. *Kruger v. Kruger,* 73 *N.J.* 464, 468 (1977). These economic resources cover a broad spectrum. Initially a list of the parties' assets and liabilities upon a particular date should be prepared. Personal tangible property is clearly includable. *Id.* Intangibles may also constitute property. *See id.* (stating "[t]he *right* to receive monies in the future is unquestionably such an economic resource") (emphasis in original). *See also Kikkert v. Kikkert,* 177 *N.J.Super.* 471 (App.Div.), aff'd o.b., 88 *N.J.* 4 (1981) (holding a vested pension plan providing future monetary benefits to be equitably distributable).

As distinguished from tangible assets, intangibles have no intrinsic value, but do have a value related to the ownership and

---

[2]Gifts, devises or bequests, except interspousal gifts, are excluded. L.1980, c. 181, § 1, effective December 31, 1980.

possession of tangible assets. Some intangibles, such as a trademark, trade name or patent, are related to an identifiable tangible asset. Goodwill, which is another intangible, is not. Often referred to as "the most 'intangible' of the intangibles," D. Kieso & J. Weygandt, *Intermediate Accounting* 570 (3d ed.1980), goodwill is essentially reputation that will probably generate future business. Lord Eldon expressed that thought in *Cruttwell v. Lye,* 17 *Ves.* 335, 346, 34 *Eng.Rep.* 129, 134 (Ch. 1810): "The good-will, which has been the subject of sale, is nothing more than the probability, that the old customers will resort to the old place."

Justice Cardozo when Chief Judge of the New York Court of Appeals embraced the same concept when he wrote:

Men will pay for any privilege that gives a reasonable expectancy of preference in the race of competition. Such expectancy may come from succession in place or name or otherwise to a business that has won the favor of its customers. It is then known as good will. [*In re Brown,* 242 *N.Y.* 1, 6, 150 *N.E.* 581, 582 (1926) (citation omitted)]

*See also* J. Story, *Commentaries on the Law of Partnership* § 99, at 157–61 (7th ed.1881).

There can be no doubt that goodwill exists. It is a legally protectible interest. *See J.B. Liebman & Co. v. Leibman,* 135 *N.J.Eq.* 288, 292 (Ch.1944). Indeed, we have enforced a restrictive covenant limiting a seller's right to compete that was designed essentially to protect the goodwill of the business for the buyer. *Solari Indus. v. Malady,* 55 *N.J.* 571, 576 (1970). The New Jersey inheritance tax, *N.J.S.A.* 54:34–1, requires consideration of goodwill. *See, e.g., In re Hall's Estate,* 99 *N.J.L.* 1 (Sup.Ct.1923), aff'd o.b., 100 *N.J.L.* 405 (E. & A. 1924); *Schneider v. Zink,* 2 *N.J.Super.* 53 (App.Div.1949); *In re Deutz,* 105 *N.J.Eq.* 671 (Prerog.Ct.1930). Upon dissolution of a partnership goodwill has been recognized as an element in determining value for purposes of liquidation. *Blut v. Katz,* 13 *N.J.* 374 (1953). In *Kanzler v. Smith,* 123 *N.J.Eq.* 602 (1938), the Court of Errors and Appeals held that the legally contemplated liquidation of partnership property upon the death of a partner required "an accounting by the surviving partner for the value of the de-

ceased partner's interest, including the value of goodwill, if any." *Id.* at 606 (citation omitted).

The basic notion expressed by Lord Eldon in *Cruttwell* was embellished by Chief Justice Gummere in *Hall's Estate, supra,* where he observed that goodwill consisted of several elements, including:

> the right to continue the business at the same place in which it has been established and where its reputation has been made, carrying with it the probability that old customers will continue to resort to the old place for the purpose of making their purchases, notwithstanding the change in the name under which the business has been carried on, so long as the service remains satisfactory and the standard of the goods sold is maintained; and this element undoubtedly has value, although perhaps not so much as the continued use of the name under which the business has theretofore been conducted.

> But assuming this view to be unsound, a mere right to acquire the good-will of a business, which may be exercised or not at the option of the holder of that right, is not the equivalent of the ownership of the good-will. Good-will is property. [99 *N.J.L.* at 4–5]

The accounting profession has further expanded the concept of goodwill to encompass other advantages of an established business that contribute to its profitability. J.M. Smith & K.F. Skousen, *Intermediate Accounting* 283 (7th ed. standard vol. 1982), capture this thought in their definition:

> Goodwill is generally regarded as the summation of all the special advantages, not otherwise identifiable, related to a going concern. It includes such items as a good name, capable staff and personnel, high credit standing, reputation for superior products and services, and favorable location.

*See also* Accounting Principles Board, Op. 17, "Intangible Assets," in *FASB Financial Accounting Standards* 266–72 (1981).[3] In a broad sense goodwill includes a whole host of intangibles including the quality of management, the ability of the organization to produce and market efficiently, and the existence and nature of competition. Some writers have been careful to differentiate between going concern value and goodwill. *See*

---

[3]APB Opinions are authoritative statements by the American Institute of Certified Public Accountants of generally accepted accounting principles. *See* "Forward," *FASB Financial Accounting Standards, supra;* 2 *APB Acc'ting Principles (CCH)* § 510.08, at 33 (1973).

Paulsen, "Goodwill and Going Concern Value Reconsidered," *Mergers & Acquisitions,* Winter 1980, at 10. Goodwill is keyed to reputation; going concern value to the enhanced value of the assets due to their presence in an established firm. *See* Danzig & Robison, "Going Concern Value Reexamined," *The Tax Adviser,* Jan. 1980, at 32. Going concern value has many of the characteristics of goodwill and in many situations will constitute an asset enhancing the value of an enterprise. In that event it will be a component of the property subject to equitable distribution. Going concern value may be prevalent in some law firms. It is probably not significant in an individual law practice, as is probably the case here. We note no claim has been made on that basis.

Goodwill can be translated into prospective earnings. From an accounting standpoint goodwill has also been perceived of in terms of the extent to which future estimated earnings exceed the normal return on the investment. Walker, "Why Purchased Goodwill Should be Amortized on a Systematic Basis," 95 *J. Acc'tancy* 210, 213 (1953); *accord,* Rev.Rul. 59–60, § 4.02(f), 1959–1 *C.B.* 237, 241 (stating that value of goodwill "rests upon the excess of net earnings over and above a fair return on the net tangible assets"). The price paid for goodwill then is equivalent to the excess of actual earnings over expected earnings based on a normal rate of return on investment. Walker, *supra,* at 213; *see* Kerley, "Intangible Assets," in 1 *Accountants' Handbook* 23–10 (L. Seidler & D. Carmichael 6th ed.1981). When goodwill exists, it has value and may well be the most lucrative asset of some enterprises.

Variances in the forms of an enterprise do not eliminate goodwill, though they may affect its worth. Goodwill may be present whether that form is a partnership, corporation, joint venture, or individual proprietorship. *See Grayer v. Grayer,* 147 *N.J.Super.* 513, 520 (App.Div.1977); *Scherzer v. Scherzer,* 136 *N.J.Super.* 397, 400 (App.Div.1975) (holding no essential difference so far as equitable distribution principle is concerned between an interest in an individual business and one held in

corporate name: "The form should not control"), certif. den., 69 *N.J.* 391 (1976). Moreover, goodwill exists in personal service enterprises as well as other businesses. 2 *B. Bittker, Federal Taxation of Income, Estates and Gifts* ¶ 51.9.3, at 51–53 (1981).

In a publicly held corporation one can determine the total value of a business whose stock is publicly traded and therefore its goodwill by the market price of the stock. G. Catlett & N. Olson, *Accounting for Goodwill* 14 (1968). The excess over the book or market value of its assets, however, may also be due to many and diverse conditions affecting the economy as a whole and an industry in particular. The value of stock in a closely held corporation is not fixed by public trading. Its computation depends primarily on the earning power of the business "since goodwill by nature encompasses all those intangible attributes of a business whose quality can be demonstrated only by a company's ability to make profits." *Id.*

The calculation of goodwill may depend upon the purpose for which the measurement is being made. The federal Internal Revenue Service has prescribed a formula approach for income, gift and estate tax purposes. *See* Rev.Rul. 68–609, 1968–2 *C.B.* 327. The market place, as noted above, may often provide a different figure. Accountants will usually not reflect goodwill on a balance sheet until after a business has been sold and then state goodwill in terms of the excess paid for the net assets over book value. G. Catlett & N. Olson, *supra*, at 17. Its evaluation may be complex and difficult. Judge Pressler in *Lavene v. Lavene*, 148 *N.J.Super.* 267, 275 (App.Div.), certif. den., 75 *N.J.* 28 (1977), commented:

> There are probably few assets whose valuation imposes as difficult, intricate and sophisticated a task as interests in close corporations. They cannot be realistically evaluated by a simplistic approach which is based solely on book value, which fails to deal with the realities of the good will concept, which does not consider investment value of a business in terms of actual profit, and which does not deal with the question of discounting the value of a minority interest.

## II

Our limited concern involves the existence of goodwill as property and its evaluation for purposes of equitable distribu-

tion under *N.J.S.A.* 2A:34–23 with respect to attorneys and in particular individual practitioners. Though other elements may contribute to goodwill in the context of a professional service, such as locality and specialization, reputation is at the core. Paulsen, *supra,* at 10. It does not exist at the time professional qualifications and a license to practice are obtained. A good reputation is earned after accomplishment and performance. Field testing is an essential ingredient before goodwill comes into being. Future earning capacity *per se* is not goodwill. However, when that future earning capacity has been enhanced because reputation leads to probable future patronage from existing and potential clients, goodwill may exist and have value. When that occurs the resulting goodwill is property subject to equitable distribution.

We held in *Lynn v. Lynn,* 91 *N.J.* 510 (1982), that a license to practice medicine and a medical degree were not property. They reflected only a possibility of future earnings. This holding was consonant with the proposition in *Stern v. Stern,* 66 *N.J.* 340, 345 (1975), that potential earning capacity is not property within the meaning of the statute, though relevant on the issues of alimony and of determining equitable proportions for the distribution of property.

When, however, the opportunity provided by the license is exercised, then goodwill may come into existence. Goodwill is to be differentiated from earning capacity. It reflects not simply a possibility of future earnings, but a probability based on existing circumstances. Enhanced earnings reflected in goodwill are to be distinguished from a license to practice a profession and an educational degree. In that situation the enhanced future earnings are so remote and speculative that the license and degree have not been deemed to be property. The possibility of additional earnings is to be distinguished from the existence of goodwill in a law practice and the probability of its continuation. Moreover, unlike the license and the degree, goodwill is transferable and marketable. Though there is an

apparent limitation on the part of an individual practitioner to sell a law practice, the same is not true in a law firm.

After divorce, the law practice will continue to benefit from that goodwill as it had during the marriage. Much of the economic value produced during an attorney's marriage will inhere in the goodwill of the law practice. It would be inequitable to ignore the contribution of the non-attorney spouse to the development of that economic resource. An individual practitioner's inability to sell a law practice does not eliminate existence of goodwill and its value as an asset to be considered in equitable distribution. Obviously, equitable distribution does not require conveyance or transfer of any particular asset. The other spouse, in this case the wife, is entitled to have that asset considered as any other property acquired during the marriage partnership.

Other jurisdictions have accepted the principle that an attorney's goodwill is property subject to equitable distribution. In *In re Marriage of Lopez*, 38 *Cal.App.*3d 93, 107, 113 *Cal.Rptr.* 58, 67 (1974), in discussing goodwill, the court quoted approvingly the following language from *Golden v. Golden,* 270 *Cal.App.*2d 401, 405, 75 *Cal.Rptr.* 735, 738 (1969):

[I]n a matrimonial matter, the practice of the sole practitioner husband will continue, with the same intangible value as it had during the marriage. Under principles of community property law, the wife, by virtue of her position of wife, made to that value the same contribution as does a wife to any of [the] husband's earnings and accumulations during marriage. She is as much entitled to be recompensed for that contribution as if it were represented by the increased value of stock in a family business.

See also the following cases in which courts have held goodwill in a law practice to be subject to distribution: *In re Marriage of Fenton,* 134 *Cal.App.*3d 451, 460, 184 *Cal.Rptr.* 597, 600 (1982); *Todd v. Todd,* 272 *Cal.App.*2d 786, 78 *Cal.Rptr.* 131 (1969); *In re Marriage of Kaplan,* 23 *Wash.App.* 503, 597 *P.*2d 439 (1979); *In re Marriage of Freedman,* 23 *Wash.App.* 27, 592 *P.*2d 1124 (1979). New York decisions are split on whether goodwill of a law practice is subject to equitable distribution. *See Litman v. Litman,* 115 *Misc.*2d 230, 453 *N.Y.S.*2d 1003 (Sup.Ct.1982) (in the

negative); *Barton v. Barton, N.Y.L.J.,* May 20, 1982, at 10 (Sup. Ct.) (in the affirmative); *Hirschfeld v. Hirschfeld, N.Y.L.J.,* May 4, 1982, at 7 (S.Ct.) (in the affirmative).[4] Some jurisdictions have also held with respect to other professions that goodwill is property subject to distribution. *In re Marriage of Nichols,* 43 *Colo.App.* 383, 606 *P.2d* 1314 (1979) (dentist's practice); *In re Marriage of White,* 98 *Ill.App.3d* 380, 53 *Ill.Dec.* 786, 424 *N.E.2d* 421 (1981) (dentist's practice); *Hurley v. Hurley,* 94 *N.M.* 641, 615 *P.2d* 256 (1980) (doctor's practice), overruled on other grounds, *Ellsworth v. Ellsworth,* 97 *N.M.* 133, 637 *P.2d* 564 (1981); *In re Marriage of Goger,* 27 *Or.App.* 729, 557 *P.2d* 46 (1976) (dentist's practice); *In re Marriage of Fleege,* 91 *Wash.2d* 324, 327–30, 588 *P.2d* 1136, 1138–39 (1979) (dentist's practice). *Contra Nail v. Nail,* 486 *S.W.2d* 761 (Tex.1972) (goodwill of a medical practice not properly subject to division by the court).

In *Stern v. Stern,* we acknowledged that "[i]t may . . . be possible to prove that [goodwill] does exist and is a real element of economic worth. Concededly, determining its value presents difficulties." 66 *N.J.* at 346–47 n. 5 (citation omitted). However, difficulty in fixing its value does not justify ignoring its existence. Goodwill should be valued with great care, for the individual practitioner will be forced to pay the ex-spouse "tangible" dollars for an intangible asset at a value concededly arrived at on the basis of some uncertain elements. For purposes of valuing the goodwill of a law practice, the true enhancement to be evaluated is the likelihood of repeat patronage and a certain degree of immunity from competition. *See Levy v. Levy,* 164 *N.J.Super.* 542, 554 (Ch.1978). Identification of goodwill in this fashion differs from that utilized in evaluating

---

[4]The New York Court of Appeals recently held that the goodwill of a dental practice could be sold by the deceased dentist's wife who was the sole beneficiary of his estate, noting that the sale of goodwill included something other than the personal attributes of a professional, such as the right to practice at the same location. *Spaulding v. Benenati,* 57 *N.Y.2d* 418, 442 *N.E. 2d* 1244, 456 *N.Y.S.2d* 733 (1982).

goodwill in businesses where an identification of a return on tangible assets is made.

For example, the Internal Revenue Service has prescribed a formula approach for federal tax purposes when there is no better basis for valuation. *See* Rev.Rul. 68–609, *supra,* 1968–2 *C.B.* 327. It requires a determination of income from the tangible assets, and subtraction of that income from the total income. The residual is capitalized and the balance is designated goodwill. For similar methods see G. Catlett & N. Olson, *supra,* at 13–14 (1968); Paulsen, *supra,* at 11. A law office's tangible asset value is so disproportionately small when compared to the value of the services rendered that measurement by these methods would not be meaningful.

Other methodologies have been developed in the market place for particular businesses or professions. It is common in evaluating goodwill of an accountant's practice to compute goodwill on the basis of a percentage of annual gross income. "Valuing an Accounting Practice," *The Practicing CPA,* Mar. 1982, at 1; Wright, "On Buying and Selling a Practice," *J. Acc'tancy,* Jan. 1982, at 38. In the medical profession a charge per patient card has sometimes been utilized, *see* Fallon, "What's Your Practice Worth—in Cash?," *Med. Econ.,* Jan. 22, 1979, at 180, as well as a percentage of annual gross income, *see* Balliett, "Private Practice: How to Quit at a Profit," *Med. World News,* Dec. 25, 1978, at 40, or a percentage of annual net income, *see* Cantor, "The Value of a Lawyer's Interest in His Practice," 43 *N.Y.St.B.J.* 47, 50 (1971) (quoting Bernard D. Hirsh, General Counsel for the American Medical Ass'n).

■ A significant element in fixing an attorney's goodwill is that an attorney as a sole practitioner cannot sell his law practice, *see Geffen v. Moss,* 53 *Cal.App.*3d 215, 125 *Cal.Rptr.* 687 (1975), and when any attorney severs his relationship with a law practice, a restrictive covenant to protect goodwill is unavailable, *see Karlin v. Weinberg,* 77 *N.J.* 408, 418 (1978) (dic-

tum).[5] *Contra Hicklin v. O'Brien,* 11 *Ill.App.*2d 541, 138 *N.E.*2d 47 (1956); *Heinz v. Roberts,* 135 *Iowa* 748, 110 *N.W.* 1034 (1907); *Thorn v. Dinsmoor,* 104 *Kan.* 275, 178 *P.* 445 (1919) (upholding sale of a law practice to a law student not yet admitted to practice). Drinker in his treatise on legal ethics states that "[a] lawyer's practice and good will may not be offered for sale." H. Drinker, Legal Ethics 161 (1953) (footnote omitted); *accord* R. Wise, *Legal Ethics* 204 (2d ed.1970) ("Goodwill cannot be sold as clients are not chattels or merchandise and a lawyer is not a tradesman") (footnote omitted). This principle has been accepted and announced by our Advisory Committee on Professional Ethics, Op. 48, 87 *N.J.L.J.* 459 (1964).

The underlying basis for the principle proscribing a restrictive covenant is the prohibition against an attorney selling his practice including goodwill. DR 2–108(A) of our *Disciplinary Rules of the Code of Professional Responsibility,* prohibiting such restrictions, reads as follows:

> A lawyer shall not be a party to or participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement, except as may be provided in a bona fide retirement plan and then only to the extent reasonably necessary to protect the plan.

*See also Dwyer v. Jung,* 133 *N.J.Super.* 343 (Ch.), aff'd o.b., 137 *N.J.Super.* 135 (App.Div.1975); N.J. Advisory Comm. on Professional Ethics, Op. 147, 92 *N.J.L.J.* 177 (1969); *Model Rules of Professional Conduct* Rule 1.8(h) (Proposed Final Draft 1981).

We do not intend herein to pass upon the soundness of the rule that prohibits the sale of goodwill, but only to note that we have approved of partnership agreements providing for payment upon a partner's retirement or death of an amount in excess of

---

[5]Medical doctors may sell their practices, *Tessmar v. Grosner,* 23 *N.J.* 193 (1957), and enter into enforceable restrictive covenants, *Karlin v. Weinberg, supra.* These factors affect the value of goodwill. *See* Ferber, "Make the Most of Your Last Business Move," *Med.Econ.,* Mar. 29, 1982, at 144; Balliett, *supra,* at 40; DeMuth & Achorn, "What You Always Needed to Know About Selling Your Practice," *Pa.Med.,* Sept. 1977, at 34.

the capital account presumably representing his share of good-will in the firm. In *Stern* we observed:

> Generally speaking the monetary worth of this type of professional partner-ship will consist of the total value of the partners' capital accounts, accounts receivable, the value of work in progress, any appreciation in the true worth of tangible personalty over and above book value, *together with good will*, should there in fact be any; the total so arrived at to be diminished by the amount of accounts payable as well as any other liabilities not reflected on the partnership books. [66 *N.J.* at 346–47 (emphasis supplied) (footnotes omitted)]

Payment to a former partner is excepted from Disciplinary Rule 2–107, prohibiting the division of fees unless services have been performed.[6] N.J.Code of Professional Responsibility DR 2–107(C); *see* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 327 (1971) (stating that it is permissible to "make payments to a retired partner or for a fixed period to the estate of a deceased partner in accordance with a pre-existing retirement plan, the amount of those payments being measured by subsequent earnings of the firm"). Thus members of a law firm may provide for selling their interest therein, including goodwill, and sole practitioners may not. *See* Sterrett, "The Sale of a Law Practice," 121 *U.Pa.L.Rev.* 306, 320–23 (1972) (justifying this distinction). It has been suggested that the individual practitioner may avoid the restriction by entering into a partnership arrangement with another attorney before retir-ing. Cantor, *supra,* at 51; *see* Winter, "Selling a Law Firm: Ethics Rules Eyed," 68 *A.B.A. J.* 406, 406 (1982) (criticizing the distinction). Indeed, England, Australia and Canada permit the sale of a solicitor's practice, including goodwill, upon death or retirement. *See* Note, "The Death of a Lawyer," 56 *Colum.L. Rev.* 606, 617–18 & n. 72 (1956). England also enforces restric-tive covenants entered into in connection with such a sale. *Id.; see, e.g., Bunn v. Guy,* 4 *East.* 190, 102 *Eng.Rep.* 803 (K.B.1803). *But see Aubin v. Holt,* 2 *K. & J.* 68, 69–70, 69 *E.R.* 696, 697 (Ch.1855) (suggesting *Bunn* is limited to agreements between

---

[6]DR 2–107(A)(3) was amended effective April 1, 1979 to permit a certified specialist to pay a referral fee provided the total fee charged the client is reasonable for the legal services rendered.

retiring partner and firm); *Thornbury v. Bevill*, 1 *Y. & C. Ch. C.* 556, 62 *E.R.* 1014 (Ch.1842) (similar arrangement between strangers not enforced).

As matters now stand limitations on the sale of a law practice with its goodwill have an adverse effect upon its value. However, as previously observed, goodwill may be of significant value irrespective of these limitations.

■ One appropriate method to determine the value of goodwill of a law practice can be accomplished by fixing the amount by which the attorney's earnings exceed that which would have been earned as an employee by a person with similar qualifications of education, experience and capability. This is a fair manner in which to resolve the goodwill constituent. An attorney who earns $35,000 per year as an employee would, as any employee, not have goodwill properly ascribable to his employment. The same attorney earning a net income of the same amount from his individual practice should likewise not be considered to have property consisting of goodwill in ascertaining the value of his practice. *See Levy v. Levy, supra.*

■ The court should first ascertain what an attorney of comparable experience, expertise, education and age would be earning as an employee in the same general locale. The effort that the practitioner expends on his law practice should not be overlooked when comparing his income to that of the hypothetical employee. A sole practitioner who, for example, works a regular sixty-hour week may have a significantly greater income than an employee who regularly works a forty-hour week, and the income may be due to greater productivity rather than the realization of income on the sole practitioner's goodwill. Next, the attorney's net income before federal and state income taxes for a period of years, preferably five, should be determined and averaged. The actual average should then be compared with the employee norm. If the attorney's actual average realistically exceeds the total of (1) the employee norm and (2) a

return on the investment in the physical assets, the excess would be the basis for evaluating goodwill.

This excess is subject to a capitalization factor. The capitalization factor is generally perceived as the number of years of excess earnings a purchaser would be willing to pay for in advance in order to acquire the goodwill. 2 J. Bonbright, *Valuation of Property* 731 (1937). The minimum capitalization factor is zero. The precise capitalization factor would depend on other evidence. Such evidence could consist of a comparison of capitalization factors used to measure goodwill in other professions, such as medicine or dentistry, adjusted, however, for ingredients peculiar to law, such as the inability to sell the practice and nonavailability of a restrictive covenant. The age of a lawyer may be particularly important because a sole practitioner's goodwill would probably terminate upon death, contrary to that of a doctor. *See Tessmar v. Grosner,* 23 *N.J.* 193, 200–01 (1957); ABA Comm. on Professional Ethics, Formal Op. 266 (1945); Note, *supra,* at 614.[7] Subject to such adjustments, the method used in a comparable profession may be applied and a figure close to the true worth of the law practice's goodwill may be obtained.

Other approaches equally or more compelling may be used. If sufficient information about the average income of attorney employees with similar background and expertise is unavailable, partnership agreements covering comparable attorneys that set forth value in excess of capital accounts may disclose a useful figure for goodwill. *See Cantor, supra,* at 52–53 (referring to surveys of law firms to ascertain policies for

---

[7]Note the dictum in *Kremelberg v. Thompson,* 87 *N.J.Eq.* 655, 659 (E. & A.1917), adopting the view generally that "[t]he good-will of the business of a successful professional man, practicing alone, if good-will it may be called, dies with him. He is employed because of his personal ability and reputation." The validity of this dictum with respect to professions other than lawyers is questionable. *See Tessmar, supra.*

valuing a terminating partner's interest). In *Stern* we agreed that the law partnership agreement may determine the worth of a lawyer's practice including goodwill upon proof that the books are well kept and the partner's interests are carefully reviewed periodically. 66 *N.J.* at 347.

██ There may well be other ways in which goodwill may be computed and we do not by the suggestions made herein intend to preclude their use. *See, e.g.,* Hitchman, "The Fair Market Value of a Law Practice," 15 *L. Soc'y Upper Can. Gaz.* 303 (1981); Dlugatch & Olds, "Goodwill Determination in Professional Practice Evaluation—Pursuant to a Marriage Dissolution," 4 *Glendale L.Rev.* 28, 34–36 (1982). In any event the limitations to which we have previously alluded, as well as the expertise and age of the individual should be factored into any evaluation. Moreover, potential federal tax consequences should be considered in determining equitable distribution.

### III

██ Pointing out what not to do is sometimes as illuminating as what to do. In the case at hand the trial court accepted the calculation of the defendant's expert in fixing goodwill. We find several shortcomings in its method. First, it averaged four instead of five years of the plaintiff's income because plaintiff did not operate through the entire year 1974 as a professional corporation. That did not justify its elimination. The form of plaintiff's practice as an individual or as a professional corporation is irrelevant. Plaintiff's income for that year included the salary earned from his professional association and his income from his practice as an individual, or a total of $62,553. Instead of a four-year average of $104,630 used by the defendant's expert and accepted by the trial court, it would have been preferable to commence with plaintiff's five-year average income of $96,214.

Second, in determining plaintiff's actual income, the expert included promotion, travel and automobile expenses incurred in each of the years. These would appear to be appropriate deductible business expenses in the absence of evidence demonstrating that they were not properly incurred as such.

Third, the expert used as a comparison information compiled from the federal Internal Revenue Service data for the twelve months ended June 30, 1976. The comparative group was attorneys generally throughout the United States. There was no showing how New Jersey or northern New Jersey attorneys fit into that milieu. More particularly, there was no evidence that attorneys of comparable age and expertise had assets approximately equivalent to the averages shown.

Fourth, the most troublesome aspect of the expert's estimation process comes to light upon an examination of his use of these statistics. He compared plaintiff with others, relying solely on the dollar amount of *assets* on a particular date, despite the fact that plaintiff's assets varied widely during the relevant period due to the large fluctuations in the amount of cash on hand. He then found the average percentage of total receipts retained by attorneys before taxes in the form of executive compensation and net income—38.5%. This percentage was applied to plaintiff's gross income for each year. Because of large fluctuations in cash on hand or accounts receivable that may occur during certain periods of the year, attorneys may be placed in one category rather than another by pure happenstance. Moreover, in the absence of some evidence to the contrary, a classification of attorneys based on the assets in their offices does not appear to be relevant in determining the normal or average income for comparison purposes.

The expert concluded that any excess of plaintiff's income for each year over the figure calculated using the average rate of efficiency (38.5%) reflected goodwill. The expert's analysis may be summarized as follows:

|      | Actual Total Fees Received | 38.5% | Actual Net Income | Excess |
|------|----------------------------|-------|-------------------|--------|
| 1978 | $222,702 | $87,280 [sic] | $124,090 | $36,810 |
| 1977 | 146,151  | 56,268        | 88,610   | 32,342 |
| 1976 | 185,095  | 71,262        | 107,795  | 36,533 |
| 1975 | 149,435  | 57,532        | 98,028   | 40,496 |

The underlying fallacy in this approach is that the measurement reflects the relative *efficiency* of the operation, rather than comparing plaintiff's net income with other attorneys.

Lastly, the expert used a factor of five, that is, he multiplied the average excess earnings which he had calculated to be $36,545 by five, in order to fix goodwill. No evidence supported capitalization at that figure. Our New Jersey inheritance practice indicates a frequent use of three in evaluating goodwill in close corporations or partnerships and Bonbright points out that in New York three is the factor regarded as least in need of justification. *See* 2 J. Bonbright, *supra*, at 731.[8] When calculating the value of an attorney's goodwill, the court should also consider the risks and competitiveness of the practice. A string of recent successes in contingent fee cases, for example, may lead to overestimating expected income, although averaging over a number of years will correct for many of such distortions. Even a properly adjusted estimate may reflect a portion of income attributable to return on risk-taking by the attorney, rather than on his reputation. Similarly, a practice in

---

[8] *See* G. McCarthy & R. Healy, *Valuing a Company* 378 (1971) (expressing the thought that usually the price paid for goodwill of a small professional service is low relative to valuations of large businesses and may be two to three times net income before federal income taxes, adjusted by eliminating the compensation a buyer would expect to receive as an employee for the services to be rendered and the profit generated by the business that the buyer does not expect to retain).

a highly competitive field might reduce the estimated value of an attorney's goodwill. If consideration is given to plaintiff's work life expectancy, to his inability to sell the practice, to his inability to grant a restrictive covenant, and to the competitiveness and risks of the practice, a factor of five is inordinately high.

## IV

Plaintiff raises several other issues. He complains that the trial court erred by including the annual pension payments in calculating his yearly income and also by including accrued pension as an asset subject to equitable distribution. This contention is misplaced. When the funds used for pension purposes were being earned during a particular year, they represented additional compensation in that period. Upon accrual, the pension fund thus created became a distributable asset. This fund is analogous to income accumulated in a bank account which is subject to equitable distribution.

In evaluating the law practice, the trial court did not accept the accounts receivable as of December 31, 1978, because the amount of that account varied so widely. Instead the trial court averaged the receivables on a twelve months basis and used the monthly average in fixing this asset. This was an acceptable and rational normalization method. The plaintiff asserts that the payables averaged $17,830 monthly and there should have been a deduction in that amount. We stated in *Stern* that the total assets should be diminished by the amount of accounts payable. 66 *N.J.* at 346–47. The record is unclear as to the status of accounts payable. Upon remand, plaintiff may have the opportunity to submit proofs of accounts payable and, if established, he would be entitled to credit for them.

The judgment is reversed and the cause remanded to the trial court for further proceedings to determine the value of plaintiff's law practice with respect to goodwill and accounts payable and for modification of equitable distribution, which may or may not affect the quantum of appropriate alimony.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*For affirmance*—None.

BETTY L. PERNA AND THOMAS R. PERNA, JR., PLAINTIFFS-AP-
PELLANTS, v. MICHAEL J. PIROZZI, M.D., ANTHONY DEL
GAIZO, M.D., AND PATRICK N. CICCONE, M.D., DEFEND-
ANTS-RESPONDENTS, AND MANSOOR KARAMOOZ, M.D.,
DEFENDANT.

Argued October 25, 1982—Decided March 2, 1983.

*William O. Barnes, Jr.,* argued the cause for appellants (*Barnes & Barnes,* attorneys).

*John L. Shanahan* argued the cause for respondents (*Shanahan & McLarty,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal challenges the validity of *R.* 4:21, which requires the pre-trial submission of medical malpractice claims to a panel consisting of a judge, an attorney and a physician. More specifically, the appeal questions whether a plaintiff may cross-examine a defendant-doctor about alleged prior inconsistent statements at a panel hearing and whether the trial court may refuse to permit a plaintiff to show possible bias of the panel-doctor in favor of the defendant-doctor. With respect to the latter issue, plaintiffs did not object to the doctor at the time of the panel hearing, but sought at trial to introduce a questionnaire in which the panel-doctor indicated that he knew the defendant-doctors. The appeal questions further whether *R.* 4:21 results in an unconstitutional denial of the right to trial by jury and of equal protection.

In addition, the appeal inquires about the nature of the cause of action of a patient who consents to surgery by one surgeon but is actually operated on by another surgeon. Plaintiffs resist the characterization of their cause of action as a battery and contend that a non-consensual substitution of one surgeon for another is more appropriately characterized as a violation of the doctrine of informed consent. We must determine whether that substitution, even when the two surgeons are engaged in a group practice, constitutes malpractice, a battery or both.

The medical malpractice panel unanimously found no basis for plaintiffs' claims of malpractice, but made no determination on the informed consent issue, which it found to be purely factual and, thus, not subject to panel disposition. See *R.* 4:21–2(d).

At trial, the panel determination was admitted in evidence. The trial court, however, refused to permit plaintiffs to show that the panel-doctor, in answer to a questionnaire submitted to prospective panelists, had stated that he was acquainted professionally with defendant Dr. Pirozzi. Also, the court refused to permit cross-examination of Dr. Pirozzi about prior inconsistent statements he allegedly made before the panel. The jury returned a verdict of no cause of action in favor of defendants.

In affirming the judgment of the trial court, the Appellate Division sustained the constitutionality of *R.* 4:21 and ruled that the operation by a doctor other than the one identified in the consent form is not malpractice, but a battery. 182 *N.J.Super.* 510 (1982). We granted certification, —— *N.J.* —— (1982).

We agree that *R.* 4:21 is constitutional and that the operation by the second physician may be considered to be a battery. However, we conclude that the trial court's refusal to permit plaintiffs to show possible bias of the panel-doctor and to impeach the testimony of the defendant-doctor constituted reversible error. Consequently, we reverse and remand the matter to the Law Division.

I

On the advice of his family physician, Thomas Perna entered St. Joseph's Hospital on May 8, 1977 for tests and a urological consultation. Mr. Perna consulted Dr. Pirozzi, a specialist in urology, who examined Mr. Perna and recommended that he undergo surgery for the removal of kidney stones.

Dr. Pirozzi was associated with a medical group that also included Drs. Del Gaizo and Ciccone. The doctors testified at trial that their medical group customarily shared patients; no doctor had individual patients, and each doctor was familiar with all cases under care of the group. Further, it was not the practice of the group to inform patients which member would operate; the physicians operated as a "team," and their regular practice was to decide just prior to the operation who was to operate. If, however, a patient requested a specific member of the group as his surgeon, that surgeon would perform the operation. Nothing indicated that Mr. Perna was aware of the group's custom of sharing patients or of their methods for assigning surgical duties.

---

INFORMED CONSENT TO OPERATION OR OTHER SPECIAL PROCEDURE