TOMIE SUE FORD, APPELLANT/CROSS-RESPONDENT, *v.* WILLIAM R. FORD, JR., M.D., RESPONDENT/CROSS-APPELLANT.

No. 18941

November 27, 1989 782 P.2d 1304

*Cooke, Roberts & Reese,* Reno, for Appellant/Cross-Respondent.

---

[3]We have carefully considered the parties' other contentions and find that they are without merit.

*Jack Sullivan Grellman* and *Beasley & Holden,* Reno, for Respondent/Cross-Appellant.

## OPINION

*Per Curiam:*

Dr. William Ford and Tomie Sue Ford were married in March 1971. Besides his private orthopedic surgery practice, Dr. Ford is a clinical professor of medicine at the University of Nevada-Reno, chief of orthopedic surgery at the Veterans Administration Hospital, and responds to emergency room calls from Washoe Medical Center and Sparks Family Hospital.

At the time of their divorce trial in 1986, the total net worth of the community estate was $2,070,717, including a note receivable (the Scanlin note) which, at maturity in 1988, would pay $874,750. After trial, the district court awarded assets worth $1,236,417 to Dr. Ford, and assets worth $834,300 to Tomie Sue. However, in order to effectuate a 50/50 split of the community property, the court ordered Dr. Ford to give an equalizing promissory note worth $201,058 to Tomie Sue. Consequently, both parties received property worth $1,035,358. The trial court valued Dr. Ford's medical practice at $181,926, including $97,598 in goodwill. The court also awarded the Scanlin note to Dr. Ford, without consideration for the tax consequences that would accrue when the note came due in January 1988. Finally, the court ordered Dr. Ford to pay $2,500 per month to Tomie Sue for six years as rehabilitative alimony.

At the time of the trial in October and November 1986, Dr. Ford and Tomie Sue owned, as community property, 200 shares of stock in Sierra Management Services, Inc. (Sierra Management). During trial, the parties stipulated that the stock was worth $400,000 or $2,000 per share. At the conclusion of the trial, in order to avoid federal income tax liability for Dr. Ford, the district court awarded the stock to Tomie Sue.

However, in December 1986, prior to the entry of judgment, the Washoe Medical Center purchased ninety percent of Sierra Management, including the stock held by Tomie Sue, for $3,000 per share. Thus, before entry of the January 1987 divorce decree and judgment, Tomie Sue sold her interest in the corporation for $600,000, $200,000 more than its stipulated value. On December 23, 1986, Dr. Ford filed a motion requesting the district court to reopen the divorce proceedings for the purpose of hearing additional testimony concerning the valuation of the Sierra Management stock and the award of alimony.

Without ruling on Dr. Ford's motion to reopen, the district court entered its divorce decree and judgment in January 1987. The district court confirmed its order to Dr. Ford to pay Tomie Sue rehabilitative alimony in the amount of $2,500 per month. The trial court also ordered Dr. Ford to pay $25,000 in attorneys' fees to Tomie Sue.

Eventually, on April 21, 1987, the district court granted Dr. Ford's limited motion to reopen. After a hearing, the court found that Tomie Sue will receive $18,000 in interest each year on the $200,000 received in excess of the stipulated value of the stock. Accordingly, the district court held that alimony was no longer necessary. Finally, the court rescinded its award of attorneys' fees to Tomie Sue. Tomie Sue appeals from the district court's decision, and because she makes a meritorious challenge to the trial court's rescission of her alimony and attorneys' fees, we reverse and remand.

In his cross-appeal, Dr. Ford argues that the district court erred by finding that his medical practice contained goodwill worth $97,598. We believe that the better case authority supports the district court's decision. Dr. Ford also contends that the district court erred by not taking into account the tax consequences of the upcoming maturation of the Scanlin promissory note awarded to him. This contention has merit, and therefore, we also reverse and remand on the cross-appeal.[1]

[1]Preliminarily, we reject a motion filed by Tomie Sue to dismiss Dr. Ford's cross-appeal. Tomie Sue argues that by accepting benefits and properties under the terms of the divorce decree, Dr. Ford has waived his right of

## Tomie Sue's Appeal

Tomie Sue argues that the district court erred when it granted Dr. Ford's Motion to Reopen Trial for the limited purpose of hearing additional testimony concerning the valuation of the Sierra Management stock and the award of rehabilitative alimony. Specifically, she contends that the value of the stock was a matter of stipulation and agreement between the parties, and that the district court based its order to reopen the proceedings upon facts which occurred subsequent to trial rather than "newly discovered evidence."[2]

However, the decision to reopen a case for the introduction of additional evidence is within the sound discretion of the trial court. Andolino v. State of Nevada, 99 Nev. 346, 351, 662 P.2d 631, 634 (1983). In order that justice be done, district courts should freely grant leave to amend and reopen. *Id.* When an essential element of a party's case can be easily and readily established by reopening the case, refusal to reopen will most often constitute an abuse of discretion. *Id.*

· In the instant case, after the close of testimony but before the entry of judgment, Tomie Sue sold the Sierra Management stock for $600,000, $200,000 more than the value given to that community property at trial. Since the purpose of the trial was to devise an equitable distribution of the marital property and fair

---

appeal and is estopped from attempting to reverse the judgment. We disagree.

In general, the acceptance of benefits from a judgment bars an appeal therefrom because a party may not follow two legally inconsistent courses of action. Connelly v. Connelly, 374 N.W.2d 633, 634 (S.D. 1985). However, an exception arises when a reversal of the judgment on appeal would not affect an appellant's right to the benefit already secured. *Id.*

We believe that the *Connelly* exception applies in the instant case. In his cross-appeal, Dr. Ford does not challenge the validity of any award of property which he received pursuant to the divorce decree. Instead, Dr. Ford is simply asking for more of the community assets. Accordingly, we deny Tomie Sue's motion to dismiss Dr. Ford's cross-appeal. 374 N.W.2d at 634-635. *See also* Cunningham v. Cunningham, 60 Nev. 191, 197, 102 P.2d 94 (1940) (holding that when the purpose of an appeal from a divorce judgment is to secure more property and alimony, a prior acceptance of alimony and marital property will not operate as a waiver of the right to appeal).

[2]According to NRCP 59(a)(3) and (4), the district court may grant a new trial to all or any of the parties and on all or part of the issues because of "[a]ccident or surprise which ordinary prudence could not have guarded against," or "[n]ewly discovered evidence material for the party making the motion which he could not, with reasonable diligence, have discovered and produced at the trial."

provisions for spousal and child support, the trial court served the interests of justice by reopening the case. *Id.*

In its order granting Dr. Ford's motion to reopen the case, the district court agreed to consider only whether, in light of the sale of the Sierra Management stock, an award of alimony or attorneys' fees to Tomie Sue was still appropriate. The district court refused to hear evidence regarding the impact of the stock sale on Tomie Sue's financial status, specifically, the $133,000 tax liability which she incurred as a result of the sale.[3] Tomie Sue contends that the court's refusal to hear this evidence was error. We believe that her contention has merit.

In the instant case, Tomie Sue presented evidence of the $133,000 capital gains tax bill which she incurred as a result of the stock sale. Courts can consider potential tax liability when valuing marital assets when a taxable event has occurred as a result of the divorce or equitable distribution of property, or is certain to occur within a time frame so that the trial court may reasonably predict the tax liability. Hovis v. Hovis, 541 A.2d 1378, 1380-1381 (Pa. 1988). When dividing community property, trial courts must consider tax consequences when, as in the case at hand, there is proof of an immediate and specific tax liability. In re Marriage of Clark, 145 Cal.Rptr. 602, 606 (Ct.App. 1978). Accordingly, in this case, we hold that the district court erred by refusing to consider the tax consequences when it reopened the trial to hear testimony concerning the sale of the stock. *Id.*

The district court assumed that Tomie Sue would earn $18,000 in interest annually on the $200,000 received in excess of the stipulated value of the Sierra Management stock. Because of this increased cash flow to Tomie Sue, the court held that any further award of alimony was unnecessary. Tomie Sue argues that the district court erred when it terminated her remaining monthly alimony payments of $2,500. We agree.

There are limits to the district court's discretion in awarding or refusing to award alimony. Forrest v. Forrest, 99 Nev. 602, 606, 668 P.2d 275, 278 (1983). In Buchanan v. Buchanan, 90 Nev. 209, 215, 523 P.2d 1, 5 (1974), this court provided an inexhaustive list of factors, such as the financial condition of the parties, which the district court should consider when making its alimony determination. Moreover, when making decisions involving alimony and property distribution, trial courts must form judgments as to what is just and equitable, giving regard to the respective

---

[3]If Tomie Sue must pay $133,000 in capital gains taxes, then she will realize $467,000 on the sale of the stock instead of the $600,000 sale price.

merits of the parties and to the condition in which they will be left by divorce. Heim v. Heim, 104 Nev. 605, 609-610, 763 P.2d 678, 680-681 (1988).

In the case at hand, the district court made its decision to terminate the alimony based on the $200,000 "windfall" which Tomie Sue received from the sale of the Sierra Management stock. The court apparently did not consider (1) that interest income on the proceeds would be reduced because of capital gains taxes owed as a result of the sale, and (2) that payment for the stock would be by installments extending over a period of ten years. Nevertheless, the district court expected this income to make up for Tomie Sue's lost alimony. Thus, the court failed to look at the overall justice and equity of its decision and abused its discretion by cancelling the alimony without considering the tax implications of the stock sale.

Because of the stock sale, the district court also rescinded its original award of $25,000 in attorneys' fees to Tomie Sue. We agree with Tomie Sue's argument that the rescission of attorneys' fees was error. The decision whether to award attorneys' fees to either party in a divorce action lies within the sound discretion of the district court. Hybarger v. Hybarger, 103 Nev. 255, 259, 737 P.2d 889, 892 (1987). However, as discussed above, without considering the tax consequences of the stock sale, the district court used Tomie Sue's $200,000 "windfall" to justify its decision to rescind Tomie Sue's award of $25,000 in attorneys' fees. Accordingly, the district court also abused its discretion when it abrogated the award of attorneys' fees. *Heim,* 104 Nev. at 609-610, 763 P.2d at 680-681.

### Dr. Ford's Cross-Appeal

After trial, the district court held that Dr. Ford's medical practice was community property and had a value of $181,926, including goodwill worth $97,598. Dr. Ford argues that his medical practice contains no goodwill, and therefore, the district court's valuation of his practice was erroneous.

In essence, goodwill is a reputation that will probably generate future business. Dugan v. Dugan, 457 A.2d 1, 3 (N.J. 1983). Case law is divided as to whether professional goodwill exists in the case of individual practitioners such as Dr. Ford.[4]

---

[4]In Holbrook v. Holbrook, 309 N.W.2d 343, 354 (Wis.Ct.App. 1981), the Wisconsin court of appeal refused to adopt the concept of professional goodwill as a divisible marital asset. The court held that although a professional business' good reputation is a thing of value, that reputation does not create an actual, separate property interest in those who own the business.

However, in Matter of Marriage of Fleege, 588 P.2d 1136, 1139 (Wash. 1979), the Washington Supreme Court observed that in a divorce proceeding, the modern trend is to acknowledge the existence of goodwill in a professional practice, and to take such goodwill into account when valuing the practice as part of the marital property. In *Dugan*, 457 A.2d at 5, the New Jersey Supreme Court held that goodwill exists in personal service enterprises (such as a law or medical practice) as well as other businesses, and should be considered during the equitable distribution of property at divorce. Furthermore, in In re Marriage of Foster, 117 Cal.Rptr. 49, 52 (Ct.App. 1974), the California court of appeal held that in a divorce case, courts should consider the goodwill found in a spouse's solo medical practice when distributing the community property. Accordingly, we hereby adopt the modern rule that would include a professional practice's goodwill as part of the community property estate subject to division at divorce.

Dr. Ford argues that when determining the existence of goodwill in a professional practice, the only acceptable evidence of goodwill is the amount which another professional would pay for the goodwill in acquiring the practice. Hanson v. Hanson, 738 S.W.2d 429, 435 (Mo. 1987). Accordingly, he contends that a party can show the existence of goodwill only with evidence of a recent sale of a similarly situated professional practice or expert testimony as to the existence of goodwill in a similar practice in the relevant geographic setting. *Id.* In this case, the record contains no evidence of a recent sale of a similarly situated professional practice or testimony as to the value of goodwill in similar practices. Thus, Dr. Ford contends that the district court erred by using other evidence to ascertain the existence of goodwill in his practice. We disagree and decline to follow the *Hanson* rationale.

Goodwill exists in a going professional practice, whether or not a sale is in the offing. Matter of Marriage of Fleege, 588 P.2d 1136, 1138 (Wash. 1979). In the instant case, the district court heard evidence of Dr. Ford's ongoing medical practice. Although Dr. Ford testified that his practice was not salable, potential problems in selling the practice will not eliminate the goodwill which attaches to it, nor its value as an asset to be considered in equitable distribution. Dugan v. Dugan, 457 A.2d 1, 6 (N.J. 1983). Accordingly, the district court properly declined to follow the restrictive reasoning of *Hanson* and correctly found that goodwill existed in Dr. Ford's surgical practice.

■■■

Alternatively, Dr. Ford testified that the majority of his private patients are referrals from his emergency room work rather than referrals from doctors or other patients as a result of his good reputation in the community. Thus, he argues that by its nature, his medical practice does not generate a significant amount of recurrent customer patronage, a primary component of goodwill. Therefore, he contends that the district court erred by finding that his medical practice has goodwill. This contention also lacks merit.

At trial, Kenneth Fortney, a CPA called by Tomie Sue, testified as to the value of the goodwill in Dr. Ford's medical practice. Fortney utilized three methods to make his valuation, including the "three months' gross receipt method" whereby he calculated Dr. Ford's goodwill as the equivalent of three months' gross receipts of the medical practice. In its divorce decree, the district court accepted Mr. Fortney's three months' gross receipt valuation of $97,598 as the value of the goodwill in Dr. Ford's medical practice. In In re Marriage of Slater, 160 Cal.Rptr. 686, 689 (Ct.App. 1979), the California court of appeal approved any legitimate method of valuation which measures the present value of goodwill by taking into account past earnings. Thus, the record and case authority support the district court's valuation of the goodwill in Dr. Ford's medical practice. Accordingly, the district court did not abuse its discretion when it held that of the $181,926 total value of Dr. Ford's practice, $97,598 was goodwill.

■■■■

Finally, Dr. Ford argues that, as a solo practitioner, any goodwill attaching to his medical practice is specifically dependent on his continued presence in the practice, and thus, not marketable. Taylor v. Taylor, 386 N.W.2d 851, 858-859 (Neb. 1986). Dr. Ford claims that such goodwill cannot constitute community property subject to distribution at divorce. Id. Again, Dr. Ford's claim lacks merit.

In Hurley v. Hurley, 615 P.2d 256, 259 (N.M. 1980), the New Mexico Supreme Court held that at divorce, the dispositive question is not whether a doctor can sell his goodwill. Instead, a doctor's goodwill has value despite its immarketability. Id. As long as he maintains his practice, the physician will continue to receive a return on the goodwill associated with his name. Id. Under principles of community property law, a wife makes the same contribution to that goodwill as she does to any of her husband's earnings during marriage. Golden v. Golden, 75 Cal.Rptr. 735, 738 (Ct.App. 1969). Accordingly, upon dissolution, she deserves compensation for that contribution. Id.

Thus, in this case, for as long as he continues to practice medicine, Dr. Ford will continue to receive a benefit from the goodwill associated with his business. Accordingly, the district court correctly considered this goodwill to be part of the marital estate. *Hurley,* 615 P.2d at 259.

In its divorce decree, the district court awarded the "Scanlin note" to Dr. Ford. At the time of trial, this $874,750 note receivable was assigned to the Valley Bank for the payment of an indebtedness. The note matured in January 1988. Kenneth Kenevan, a CPA testifying as an expert witness for Dr. Ford, opined that at maturity, the bearer of the note would incur a tax liability of $125,000. Dr. Ford argues that the district court erred by refusing to consider this future tax liability when it valued the Scanlin note for the purpose of dividing the community property. We agree.

We noted previously that courts can consider potential tax liability when valuing marital assets if a taxable event has occurred as a result of the divorce or equitable distribution of property, or is certain to occur within a time frame so that the trial court may reasonably predict the tax liability. Hovis v. Hovis, 541 A.2d 1378, 1380-1381 (Pa. 1988). In the instant case, testimony by Kenneth Kenevan indicated that the tax liability would accrue when the Scanlin note "pays off" in January 1988. Mr. Kenevan also observed at trial that "[t]he tax liability already exists," and "would follow the note regardless of who the holder was." Accordingly, the record indicates that a taxable event pertaining to the Scanlin note was certain to occur within a certain time frame (just over a year from the trial) so that the district court could have reasonably predicted Dr. Ford's tax liability.

Trial courts should consider tax consequences of property distribution when proof exists that a taxable event has occurred during marriage or will occur in connection with the division of the community property. In re Marriage of Fonstein, 131 Cal.Rptr. 873, 879-880 n.5 (1976). In the instant case, as a result of the division of the community property, Dr. Ford incurred a substantial tax burden upon the maturation of the Scanlin note. Therefore, the district court erred when it refused to consider this liability in making its distribution of the Fords' marital estate. *Hovis,* 541 A.2d at 1380-1381.

After careful review of the parties' other contentions, we find them to be without merit. Accordingly, we order:

1. That the order rescinding alimony and abrogating the attorney's fee be, and hereby is, vacated.

2. That alimony ordered in January 1987 be, and hereby is,

reinstated, and Dr. Ford is directed to (a) pay all amounts in arrears after the order of rescission, and (b) continue payments ordered by the decree and judgment of January 1987.

3. That Dr. Ford pay the attorney fee in the amount of $25,000.

4. That Dr. Ford be given credit for tax liability on the Scanlin note, in accordance with testimony admitted at trial.

Accordingly, we remand for proceedings consistent with this opinion.