857 A.2d 1109

Michael F. SOLOMON

v.

Nancy L. SOLOMON.

No. 116, Sept. Term, 2003.

Court of Appeals of Maryland.

Sept. 13, 2004.

178

Michael F. Solomon, Potomac, for Petitioner/Cross-Respondent.

James G. Nolan (Furey, Doolan & Abell, L.L.P., on brief), Chevy Chase, for Respondent/Cross-Petitioner.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

HARRELL, Judge.

In 2000, Michael Solomon, Petitioner, and Nancy L. Solomon, Respondent, then husband and wife, initiated proceedings in the Circuit Court for Montgomery County seeking an absolute divorce, determinations as to child custody and support, and a resolution of the financial aspects of their marriage and divorce. The Circuit Court, among other things, examined the financial characteristics and lifestyle of the parties and identified and valued their marital property. Of particular relevance to the case before us, the Circuit Court, in August 2002, granted a marital award of $550,000 and $50,000 in attorney's fees to Mrs. Solomon, and ordered Mr. Solomon to pay her $6,000 in monthly rehabilitative alimony for three years, to be followed by $5,000 in monthly indefinite alimony.

Mr. Solomon appealed to the Court of Special Appeals. Mrs. Solomon filed a cross-appeal. In an extensive unreported opinion, the Court of Special Appeals affirmed the Circuit Court's judgment in part and reversed in part. Both parties petitioned this Court to grant a writ of certiorari. We granted both petitions. *Solomon v. Solomon*, 379 Md. 225, 841 A.2d

339 (2004). The following four questions are presented for our consideration.

By Mr. Solomon:

I. Whether the Circuit Court and the Court of Special Appeals erred by failing to consider tax consequences as "immediate and specific" in this case.

II. Whether the Court of Special Appeals erred in vacating the Circuit Court's $5,000 monthly indefinite alimony award based on its determination that the trial court abused its discretion in determining the amount of the alimony award.

By Mrs. Solomon:

III. Whether the Court of Special Appeals erred by failing to reverse the Circuit Court's finding that there was no irrefutable evidence that Mr. Solomon dissipated his interest in OSI [Orthopedic Systems International, Inc.].

IV. Whether the Court of Special Appeals erred in reversing the Circuit Court's finding that Mr. Solomon's country club membership is marital property, which has monetary value and can be part of the basis for the marital reward.

## I.

### A.

The Solomons married on 26 May 1986. Three children were born during their marriage: John, Michael, and Hayden.[1] The Circuit Court ordered joint legal custody of the children as part of the divorce, with Mr. Solomon maintaining primary physical custody of John and Mrs. Solomon having primary physical custody of Hayden and Michael. Mr. Solomon also has a daughter from a previous marriage.[2]

---

1. At the time of trial, John was 13 years old, Hayden 15, and Michael 17. Each suffers from learning disabilities.

2. At the time of trial, Mr. Solomon's daughter, Katrina, was 21 years old. Mr. Solomon provided financial support for Katrina.

At the time of the parties' marriage, Mr. Solomon owned a home in Potomac, Maryland. He had been a tax attorney with a law firm for ten years before the marriage, at an annual salary of almost $500,000. Prior to her marriage to Mr. Solomon, Mrs. Solomon completed three years of college, but did not obtain a degree. She lived with her parents during college and earned income sporadically in various administrative support positions.

During the marriage, Mr. Solomon's annual income grew steadily, reaching $1,050,000 in 2001. Mrs. Solomon and Mr. Solomon agreed that Mrs. Solomon would not work during the marriage. With Mrs. Solomon at home and Mr. Solomon as the breadwinner, the Solomons enjoyed a relatively luxurious lifestyle—they purchased a home on eleven acres, employed a housekeeper, took frequent vacations, acquired an expansive wine collection, and sent their children to private school. Despite Mr. Solomon's income, the parties lived beyond their means during the marriage and accumulated more than $2,000,000 in secured and unsecured debt.[3] At trial, Mr. Solomon was attempting to pay off this marital debt and professed that he would continue to do so.

The Circuit Court valued the Solomons' marital assets at a minimum of $1,364,217.55 [4] in its Amended Opinion and Order of 20 August 2002.[5] Mr. Solomon held $959,217.55 of the

---

3. The Circuit Court identified the following debts: $985,000 in mortgages on the marital home, $126,982.83 in secured debt for Mr. Solomon, $591,149.10 in unsecured debt for Mr. Solomon, and $388,632.88 in unsecured debt for Mrs. Solomon.

4. The Circuit Court valued the jointly owned assets at a minimum of $350,000. The court received evidence that the home had a fair market value of either $1,000,000 or $1,500,000. The expected net proceeds of the sale of the house, minus $985,000 in mortgage debts would be either $15,000 or $515,000, depending on the actual fair market value of the home.

5. A mathematical error and a posting error in the Circuit Court's 19 August 2002 Opinion and Order inflated Mr. Solomon's marital assets by $356,499.95 from $959,217.55 to $1,315,717.50. The Court of Special Appeals, on appeal, would later reduce the valuation of the marital assets by at least $80,000. The Court of Special Appeals

marital property titled in his name. His retirement accounts alone contained $445,731 of the marital assets. In comparison, Mrs. Solomon had only $10,000 of the marital property titled in her name.

At trial, the Circuit Court found that Mr. Solomon was 49 years old with a guaranteed annual income of $1,050,000. Mrs. Solomon was 40 years old and not working outside the home. The Circuit Court adopted an employment assessment supplied by a court-appointed expert that stated Mrs. Solomon had a reasonable earning capacity between $25,000 and $28,000 per year. Although she had not obtained employment as of the time of trial in this case, Mrs. Solomon, the Circuit Court held, had the "potential" to increase her earnings with additional education and work experience.

Mr. Solomon managed several trusts for friends and clients prior to and at the time of trial. One trust in particular, that of Mr. Solomon's social friend, Steve Goldstein, often lent money to Mr. Solomon, with Goldstein's permission. Mr. Solomon paid those loans back with interest. Mr. Solomon also managed several trusts for wealthy, longtime friend Marc Abramowitz, who also allowed Mr. Solomon to borrow money from these trusts.

During the parties' marriage, Mr. Solomon was involved in a business venture with Mr. Abramowitz, purchasing a minority interest in Orthopedic Systems International, Inc. ("OSI") in 1992. In 1995, Mizuho, a Japanese corporation, purchased a majority interest [6] in OSI. At that time, the minority shareholders, including Mr. Solomon and Mr. Abramowitz, were issued a "put" right which obligated Mizuho to buy out the

---

subtracted the $80,000 because it determined that a country club membership was not marital property, *see infra,* and remanded to the Circuit Court to account for related financial liabilities on marital property owned by Mr. Solomon that were unrecognized in the Circuit Court's Amended Order.

**6.** Mizuho obtained a 51 percent interest in OSI. This purchase left Mr. Solomon with 1, 837 shares of OSI, or a 1.3188 percent interest in OSI.

minority shareholders for a price based on the fair market value of OSI at the time the "put" right was exercised.

In 1999, the minority shareholders attempted to exercise their "puts," but were unable to agree with Mizuho on a fair market value of OSI. The minority shareholders filed a complaint in California Superior Court to enforce their "put" rights on September 7, 2000. After court-ordered arbitration, an independent arbitrator valued OSI, on a "going concern" basis, at $82,144,101 on 15 May 2001. Thus, under this valuation, Mr. Solomon's 1.3188% interest would be worth $1,083,334.

Other estimates of OSI's value presented to the Circuit Court varied between $55,000,000 by a court appointed accountant to approximately $100,000,000 by PriceWaterhouse-Cooper. As a result, Mr. Solomon's interest in OSI would have been valued between $725,340 and $1,300,000. In contrast, Mr. Solomon valued his shares of OSI in a March 2000 statement at $600,000.

The Circuit Court, however, did not resolve the value of Mr. Solomon's OSI shares. Mr. Solomon conveyed his OSI shares to one of Mr. Abramowitz's trusts in December 2000. In April of 2000, Mr. Solomon signed a $200,000 promissory note to the trust, using the proceeds to pay a $150,000 loan from 1997 from another of Mr. Abramowitz's trusts and applied the remainder for his personal use. He pledged his interest in OSI as collateral for the April 2000 note,[7] but, in the event that he defaulted on the note, retained the right to any surplus from the sale of the stock after satisfying whatever might then be owed on the $200,000 obligation.

In June and September of 2000, Mr. Solomon failed to make two required interest payments of $5,062.50 each on the note. After the trust notified him of default, Mr. Solomon conveyed his shares of OSI to the trust on 29 December 2000 in accordance with the pledge agreement, and in full satisfaction

---

7. Mr. Solomon had pledged his interest in OSI as collateral for the 1997 promissory note as well.

of the obligation. He also transferred all right, title, and interest in the shares, including the right to the surplus proceeds from a future sale of the stock. Mr. Solomon testified that he believed the value of his interest in OSI to be equal approximately to the debt amount at the time he transferred his OSI shares. Using the independent arbitrator's appraisal from the Mizuho/minority shareholder action in California, Mrs. Solomon's expert witness, as part of her evidence regarding Mr. Solomon's claimed dissipation of this asset, valued his now-forfeited interest in the eventual proceeds at $867,759.

Prior to the marriage, Mr. Solomon applied for membership in the Congressional Country Club ("the Club"), generally regarded as a prestigious social and recreational organization. He was admitted as a "summer" member in 1980, and maintained this status for several years. Shortly after marrying Mrs. Solomon in 1987, he was granted full membership in the Club. The entire Solomon family enjoyed use of the Club's facilities. Mr. Solomon paid a $25,000 initiation fee to become a full member. At the time of trial, the initiation fee for a new, full member in the Club was $80,000.

Additional facts will be supplied as necessary to our analysis of the issues.

## B.

In July and September of 2000, respectively, the Solomons initiated the present litigation by filing cross-complaints in the Circuit Court for Montgomery County. In May and June of 2002, a four-day trial was held in the Circuit Court. On 20 August 2002, the Circuit Court issued its final judgment in an Amended Opinion and Order granting Mrs. Solomon a $550,000 marital property award, without any specific judgment ordering the sale or disbursement of the marital property titled in Mr. Solomon's name. The Circuit Court also awarded Mrs. Solomon $6,000 in monthly rehabilitative alimony for three years. After determining that the difference between Mr. Solomon and Mrs. Solomon's lifestyle would

remain unconscionably disparate after the expiration of the period of rehabilitative alimony, the Circuit Court ordered $5,000 in monthly indefinite alimony. Both parties filed post-judgment motions. On 28 October 2002, the Circuit Court denied Mr. Solomon's motion and much of Mrs. Solomon's, but did grant her partial relief.[8]

On 5 November 2002, Mr. Solomon filed an appeal to the Court of Special Appeals. He argued that the Circuit Court erred in calculating the value of the martial property because it failed to consider the tax consequences he would face in liquidating his retirement accounts in order to pay the marital property award. Mr. Solomon also maintained that the trial court erred in concluding that Mr. Solomon's membership in the Club was marital property valued at $80,000.

Mrs. Solomon, in her cross-appeal, contended that the Circuit Court erred because the award of indefinite alimony was in an insufficient amount. She also claimed the Circuit Court incorrectly concluded that Mr. Solomon did not dissipate his interest in OSI while the divorce litigation was pending.

In a lengthy unreported opinion, a sometimes shifting majority of the Court of Special Appeals's panel affirmed the judgment of the Circuit Court in part, and reversed in part. The panel unanimously held that the Circuit Court acted within its discretion in not considering Mr. Solomon's tax liabilities as an "other factor" under Family Law § 8-205(b)(11). The panel agreed that the Circuit Court did not order a liquidation of the retirement account to satisfy the marital property award. Without such an order, Mr. Solomon had other methods of paying the marital award and, therefore, it was unnecessary for him to liquidate his retirement accounts. As a result, the tax liabilities of an unnecessary liquidation of the accounts were not "immediate and specific," but rather would be "speculative." The intermediate appellate

---

8. The Circuit Court amended the 20 August 2002 judgment to state expressly that the indefinite alimony payments would be due each month and to provide monthly due dates for alimony and child support payments.

court panel also agreed unanimously that the Circuit Court did not commit clear error in determining that there was insufficient evidence to persuade it that Mr. Solomon dissipated intentionally his interest in OSI.

Two members of the panel formed a majority to reverse the Circuit Court's ruling that the country club membership was marital property worth $80,000 and directed that that amount be subtracted from the marital property valuation. A different two member majority concluded that the Circuit Court abused its discretion in setting the indefinite alimony amount. That majority found the alimony amount to be unconscionably inadequate and remanded the issue to the Circuit Court for reevaluation in accordance with its opinion.

## II.

### A.

Mr. Solomon contends that the Court of Special Appeals and the Circuit Court erred in determining the amount of the marital award because they refused to consider the tax consequences he would face in prematurely liquidating his retirement accounts in order to pay the $550,000 monetary award. He asserts that the courts were obliged to consider the tax liabilities as an "other factor" under Family Law Article, § 8–205(b)(11) because the tax liabilities are immediate and specific.

The consideration of tax liabilities as an "other factor" in determining monetary awards of marital property has not been addressed by this Court. We shall consider the decisions of the Court of Special Appeals and other jurisdictions on this issue in aid of resolving this question.

### B.

The Court of Special Appeals, in *Rosenberg v. Rosenberg*, 64 Md.App. 487, 497 A.2d 485 (1985), first considered tax liabilities as a possible factor in determining the amount of the marital property award. *Rosenberg* observed that tax liabili-

ties on a marital asset presented two inter-related problems. First, the *value* of a marital asset may be lessened by a tax liability. *Id.* at 512, 497 A.2d at 497. Second, even if the *value* of a marital asset is not lessened by a tax liability, the *equitable distribution* of the property by the court may be affected by the tax liability. *Id.* at 523–26, 497 A.2d at 503–505.

Interpreting § 3–6A–05 of the Courts and Judicial Proceedings Code Article of the Md.Code,[9] *Rosenberg* held that value meant *fair market value*, or "the amount at which property would change hands between a willing buyer and a willing seller...." *Id.* at 525–26, 497 A.2d at 504 (citation omitted). Thus, tax liabilities should not be taken into account in valuing property for a marital award. *Id.* at 512, 527, 497 A.2d at 497, 504. Rather, as *Rosenberg* continued its analysis, tax liabilities may be properly considered as an "other factor" under § 3–6A–05(b)(9)[10] in the determination of the marital property award. *Id.* at 527, 497 A.2d at 504. The Court of Special Appeals, relying on cases from both community and equitable property states, *see supra*, held that Mr. Rosenberg's tax liabilities may be considered as an "other factor" in an equitable distribution of marital property only when they are "immediate and specific" or not "speculative." *Id.* at 523–26, 497 A.2d at 503–505.

*Rosenberg* held that tax liabilities for imputed interest on an interest-free loan that figured in the marital property award calculus was "immediate and specific." *Id.* at 526, 497 A.2d at

---

9. Now re-codified as § 8–204 of the Family Law Article.

10. Now section 8–205(b)(11) of the Family Law Article. Section 8–205(b) states, in relevant part:

> The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both, after considering each of the following factors: ... (11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both.

Md.Code (1984, 1999 Repl. Vol.) § 8–205(b) of the Family Law Article.

504. Mr. Rosenberg had loaned $150,000 interest free to Dorothy Bohny, the soon to be "new Mrs. Rosenberg," prior to the divorce. *Id.* at 492 n. 2, 497 A.2d at 501 n. 2. Because the loan was made from marital assets, the interest payments that would have been paid if the loan was made in the normal course of business were imputed as part of the marital property. *Id.* The Court of Special Appeals held that the trial court, which had some of Mr. Rosenberg's income tax returns in evidence before it, should consider the tax liabilities on these imputed interest payments on remand because they were "immediate and specific." *Id.* at 526, 497 A.2d at 504.

*Rosenberg* also held that future tax liabilities on the realization of retirement plan benefits and sales of assets to satisfy the marital property award were speculative and "need not be considered" on remand. *Id.* at 526, 497 A.2d at 504–505. Mr. Rosenberg claimed that he would incur tax liabilities on the gains from the sale of his assets to satisfy the marital property award of $1,520,000.[11] He also asserted that he would pay deferred tax liabilities upon realization of his retirement plan benefits. These alleged tax liabilities, he claimed, were not considered as an "other factor" in determining the equitable distribution of the marital property. *Id.* at 523–24, 497 A.2d at 503. The Court of Special Appeals rejected Mr. Rosenberg's claims after noting that, "[t]he basis for refusing to consider tax consequences is that they are too speculative— the rates may change, either by legislation or by tax bracket, and the income may be sheltered in any number of ways." *Id.* at 525, 497 A.2d at 504.

Since *Rosenberg* was decided, the Court of Special Appeals has relied on the "immediate and specific" or "not speculative" standard as a litmus test for when it is appropriate to consider tax liabilities as an "other factor," pursuant to Family Law

---

11. While not explicitly mentioned in this portion of its opinion, the Court of Special Appeals earlier recognized that Mr. Rosenberg had a net worth of approximately $33 million and an annual income in 1983 of over $850,000 plus non-cash benefits, including a new Cadillac biannually and free legal, accounting, and investing services. *Id.* at 496, 497 A.2d at 485.

Code § 8–205(b)(11). *Innerbichler v. Innerbichler,* 132 Md. App. 207, 238–40, 752 A.2d 291, 308–309 (2000) (holding that appellant's personal tax liabilities on future sales of property were speculative and possible tax liabilities facing the corporation in tax litigation with IRS were not "immediate and specific"); *Skrabak v. Skrabak,* 108 Md.App. 633, 657, 673 A.2d 732, 743–44 (1996) (holding that trial court must account for tax liabilities that are "not too speculative"); *Merriken v. Merriken,* 87 Md.App. 522, 545, 590 A.2d 566, 578 (1991) (observing that the trial court on remand must consider tax liabilities as an "other factor" if they are "more than merely speculative"); *Quinn v. Quinn,* 83 Md.App. 460, 473, 575 A.2d 764, 770 (1990) (observing that if tax liabilities are discovered on remand, they should be considered if "more than merely speculative"); *Williams v. Williams,* 71 Md.App. 22, 37, 523 A.2d 1025, 1032 (1987) (holding that if tax liabilities regarding the marital property award are presented on remand, they should be considered if not speculative).

### C.

*Rosenberg* acknowledged that other equitable distribution jurisdictions appear to have resolved this issue differently. Oregon and New York adopted an "if, as and when" test.[12] *See In the Matter of the Marriage of Rogers,* 47 Or.App. 963, 615 P.2d 412, 413–14 (1980) (modifying equitable property distribution to recipient spouse to be reduced by one half of the taxes the paying spouse will incur upon distribution of the retirement account); *Majauskas v. Majauskas,* 94 A.D.2d 494, 464 N.Y.S.2d 913, 915–16 (N.Y.App.Div.1983) (observing that the correct distribution of marital property in a pension account included distributing one half of the pension proceeds, when collected, after paying taxes). Unlike New York, Oregon, and Maryland, Wisconsin statutory law explicitly requires

------

**12.** This test is best viewed through the lens that the recipient spouse was awarded a *percentage* of a retirement account's determinable payment, not a lump sum marital property award based partly on the accumulated marital assets that included a retirement account with potential tax liabilities.

trial courts to consider tax liabilities in the equitable division of marital property. *Selchert v. Selchert,* 90 Wis.2d 1, 280 N.W.2d 293, 297 n. 6 (Ct.App.1979).

*Rosenberg* also considered the views of the community property states of Arizona and California. These jurisdictions, in determining the *value* of the marital property for community distribution, preferred the "immediate and specific" test adopted by the Court of Special Appeals. *See Johnson v. Johnson,* 131 Ariz. 38, 638 P.2d 705 (1981) (en banc); *In re Marriage of Marx,* 97 Cal.App.3d 552, 159 Cal.Rptr. 215 (1979). Normally, tax liabilities of retirement accounts are too speculative to consider because "tax rates change and that the [paying spouse's] tax bracket would probably change after his retirement." *Johnson,* 638 P.2d at 710 (citing *Marx,* 97 Cal.App.3d 552, 159 Cal.Rptr. 215). The tax liabilities of a retirement account could be considered because, "it is conceivable that the future maturity date could be so close to the date of trial that the tax consequences could be determined and could qualify as "immediate and specific"." *Marx,* 159 Cal. Rptr. at 220 n. 5.

■ We adopt the standard and underlying reasoning in *Rosenberg* and hold that tax liabilities may be considered as "other factors" for purposes of distributing a marital property award, pursuant to Family Law § 8–205(b)(11), only when they are "immediate and specific or not speculative." For example, as in the present case, claimed tax liabilities associated with an uncompelled, premature liquidation of a retirement account to satisfy an undifferentiated lump sum marital award are more apt to be regarded as speculative and not "immediate and specific," unless additional evidence in the record indicates otherwise. *See Marx; Johnson, supra.* We now turn to Mr. Solomon's arguments as to why *his* claimed tax liabilities are immediate and specific.

### D.

Mr. Solomon looks first for context outside of Maryland. He cites numerous decisions where the paying spouse effec-

tively was required to pay a marital property award from a retirement account and faced premature tax liabilities as a result.[13] *See In re Marriage of Hogeland,* 448 N.W.2d 678, 680–81 (Iowa Ct.App.1989) (holding that Iowa statutory law explicitly required the trial court to consider tax liabilities when allocating marital property in a dissolution of assets); *Schuman v. Schuman,* 265 Neb. 459, 658 N.W.2d 30, 36–37 (2003) (holding that the trial court should not consider tax liabilities unless the court finds that sale of non-retirement property is "reasonably certain" to occur); *Ford v. Ford,* 105 Nev. 672, 782 P.2d 1304, 1307 (1989) (per curiam) (holding that the trial court committed error by refusing to hear evidence of tax liabilities to recipient spouse when reversing alimony award); *White v. White,* 382 Pa.Super. 478, 555 A.2d 1299, 1301 (1989) (holding that tax liabilities may be considered under a "reasonably predicted" standard); *Dice v. Dice,* 742 P.2d 205, 208 (Wyo.1987) (holding that "after tax cash value should be reflected in a divorce-decree division if an immediate cash payment is required" from a retirement account).

Furthermore, he argues that trial courts in other jurisdictions have refused to consider such tax liabilities only when the paying spouse either presented insufficient evidence that the sole source of funds for the award was the retirement account or did not allege that the retirement asset must be sold. *See In re Marriage of Hayne,* 334 N.W.2d 347, 353 (Iowa Ct.App.1983) (holding evaluation of tax liabilities within "sound discretion" of trial court and not required); *Fechtor v. Fechtor,* 26 Mass.App.Ct. 859, 534 N.E.2d 1, 5–6 (1989) (holding that trial court's order to apportion marital property should consider tax liabilities when properly presented to trial

---

13. In effect, he argues that a trial court must consider as an additional factor when determining the property award the source of funds to pay the award. The General Assembly has listed eleven factors for equitable property distribution calculus and, based on the record in this case, we are reluctant to include "source of funds to pay the award" as a mandatory "other factor" to consider. To do so would overlap unnecessarily the trial court's discretion to transfer ownership of a "pension, retirement, profit sharing, or deferred compensation plan," pursuant to Family Law Article § 8–205(a).

court); *In re Marriage of Swanson,* 220 Mont. 490, 716 P.2d 219, 223 (1986) (holding that trial court's refusal to consider tax consequences correct when paying spouse presented no evidence that the liquidation of the retirement account was required to satisfy marital property award); *Gluck v. Gluck,* 134 A.D.2d 237, 520 N.Y.S.2d 581, 583 (N.Y.App.Div.1987) (holding that trial court properly refused to consider tax liabilities when amount is too speculative to determine); *Smith v. Smith,* 104 N.C.App. 788, 411 S.E.2d 197, 198–99 (1991) (holding trial court's failure to consider tax liabilities contrary to statute's explicit requirement to do so not erroneous when tax consequences purely speculative); *Bettinger v. Bettinger,* 183 W.Va. 528, 396 S.E.2d 709, 715–16 (1990) (holding that tax liabilities too speculative unless sale of tax-liable account actually occurs). Naturally, he distinguishes his situation from these latter cases because he alleged here that his retirement accounts must be sold and claims to have presented sufficient evidence at trial (and in a post-trial motion for reconsideration) to support this contention. We find the cases from other jurisdictions unpersuasive. They differ from the present case either: (a) in their material factual predicates; (b) their results were governed by explicit statutory requirements requiring the trial court to consider tax consequences; or, (c) the courts embraced threshold tests allowing tax liabilities to be considered broader than we are prepared to adopt.

Although his argument is expansive, Mr. Solomon's asserted tax liabilities only could have been "immediate and specific" if he had no option other than to withdraw funds from his retirement accounts in order to pay the marital award. That is not the case on this record.

The Circuit Court did not order Mr. Solomon to pay the marital property award from any specific source of funds, let alone his retirement accounts. Because Mr. Solomon was not ordered to use money from his retirement funds to satisfy the marital award, we review, under the clearly erroneous standard, the trial court's factual findings as to whether his financial situation nonetheless compelled him to do so. Md. Rule 8–131(c).

■ Both the Circuit Court and the Court of Special Appeals were persuaded that Mr. Solomon's financial profile indicated that he had several other funding sources available. First, he had a yearly seven-figure income, which substantially exceeded the monetary award of $550,000. Second, Mr. Solomon had access to several proven lending sources from which he had borrowed significant sums of money in the past.

The trial court had before it Mr. Solomon's debts and liabilities and weighed them as well as a factor in establishing the marital property award. It is not clear error for the Circuit Court to elect not to believe Mr. Solomon's protests that he would be required to liquidate his retirement accounts to discharge the monetary award. The record before the Circuit Court supports the conclusion that Mr. Solomon was not required to withdraw funds from his retirement account in order to satisfy the martial award, and any tax liabilities he may face in choosing to do so are speculative, and not immediate and specific. The Circuit Court acted within its discretion in declining to consider Mr. Solomon's speculative tax liabilities on the record before it. In turn, the Court of Special Appeals was correct to affirm this aspect of the trial court's judgment.[14]

### III.

#### A.

■ It is well settled in Maryland that the "statutory scheme generally favors fixed-term or so-called rehabilitative alimony," rather than indefinite alimony. *Tracey v. Tracey,* 328 Md. 380, 391, 614 A.2d 590, 596 (1992), *see also Turrisi v. Sanzaro,* 308 Md. 515, 524–25, 520 A.2d 1080, 1085 (1987). Underlying Maryland's statutory preference is the conviction

---

14. Mr. Solomon's alternate argument that his tax liabilities should be addressed in the *valuation* of the marital property conflicts with our present recognition of *Rosenberg's* holding that the value of marital property is its fair market value. *See supra.* Moreover, this argument was not raised in his petition for writ of certiorari and we need not address it.

that "the purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently." *Tracey*, 328 Md. at 391, 614 A.2d at 596 (citing the 1980 Report of the Governor's Commission on Domestic Relations Laws, at 4, hereinafter "1980 Report"). Nonetheless, rehabilitative alimony alone may not be appropriate in every case. *Id.* at 391, 614 A.2d at 594 (citing *Turrisi*, 308 Md. at 525, 520 A.2d at 1085).

■ In its determination of whether an award of alimony is appropriate, the trial court must consider "all of the factors necessary for a fair and equitable award" set forth in section 11–106(b) of the Family Law Article.[15] Section 11–106(c)

---

**15.** The twelve factors included in the test are non-exclusive, and "although the court is not required to use a formal checklist, the court must demonstrate consideration of all necessary factors." *Roginsky v. Blake–Roginsky*, 129 Md.App. 132, 143, 740 A.2d 125, 130 (1999). The factors include:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and non-monetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under section 8–205 [monetary award] and section 8–208 [use and possession] of the Family Law Article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits; and

further allows a trial court to order indefinite alimony if the court finds that:

> (1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or (2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

The statute places strict limits on a trial court's ability to grant indefinite alimony and requires a comprehensive case-by-case analysis. It follows that, after a determination by the trial court that the respective standards of living are unconscionably disparate, the amount of the award of indefinite alimony must relieve the unconscionably disparate condition.

The determination of whether an unconscionable disparity exists, according to section 11–106(c) of the Family Law Article, is a finding of fact, reviewed under a clearly erroneous standard. *See* Md. Rule 8–131(c). "An alimony award will not be disturbed upon appellate review unless the trial judge's discretion was arbitrarily used or the judgment below was clearly wrong." *Tracey,* 328 Md. at 385, 614 A.2d at 593. We review the *amount* of the alimony itself under an abuse of discretion standard. *See Blaine v. Blaine,* 336 Md. 49, 74, 646 A.2d 413, 425 (1994). Thus, absent evidence of an abuse of discretion, the trial court's judgment ordinarily will not be disturbed on appeal.

### B.

Mr. Solomon contends that the Court of Special Appeal's majority erred in vacating the Circuit Court's indefinite alimo-

---

(12) whether the award would cause a spouse who is a resident of a related institution as defined in [section] 19–301 of the Health General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.
Md.Code (1957, 1999 Repl. Vol., 2003 Cum. Supp.), § 11–106(b) of the Family Law Article.

ny award on the ground that the amount was insufficient. He asserts that the Circuit Court's ruling was reasonable and there is no evidence of an abuse of discretion, especially considering the "wide discretion" given the trial judge "in rendering alimony awards." Mr. Solomon suggests that the Court of Special Appeals abused its discretion in vacating the judgment of the Circuit Court. It should have shown greater deference to the Circuit Court's decision, rather than trying to "substitute its judgment for that of the court that actually heard the testimony and had the opportunity to consider the entire record absent clear error." Mr. Solomon also asserts that the factual analysis conducted by the Court of Special Appeals was faulty and incomplete.

Mrs. Solomon, on the other hand, maintains that the intermediate appellate court was correct to direct the Circuit Court to revisit its judgment in this regard. Mrs. Solomon claims the alimony amount provided in the Circuit Court's judgment maintained the unconscionably disparate state and was an abuse of the Circuit Court's discretion. We agree with Mrs. Solomon and the Court of Special Appeals that the Circuit Court abused its discretion in the amount of indefinite alimony awarded. On this record, that amount does not achieve the required result of eliminating the unconscionable disparity found by the court to exist.

## C.

The Circuit Court concluded that there was an unconscionable disparity in the Solomons' incomes and standards of living and, therefore, awarded Mrs. Solomon indefinite alimony. The Court of Special Appeals upheld this determination and it has not been challenged in this Court. Yet, the Court of Special Appeals reversed the Circuit Court's determination of the amount of the indefinite alimony awarded. This is the only aspect of the indefinite alimony award currently in controversy.

We have explained that "[g]enerally speaking, alimony awards, though authorized by statute, are founded upon no-

tions of equity, equity requires sensitivity to the merits of each individual case without the imposition of bright-line tests." *Tracey,* 328 Md. at 393, 614 A.2d at 597 (citing *Wallace v. Wallace,* 290 Md. 265, 284, 429 A.2d 232, 243 (1981)). As such, "no hard and fast rule can be laid down, and ... each case must depend upon its own circumstances...." *Alston v. Alston,* 331 Md. 496, 507, 629 A.2d 70 (1993).

There are very few reported Maryland cases in which a challenge to the adequacy of the amount of an indefinite alimony award was mounted. Usually the attack has been on the threshold determination of whether an unconscionable disparity existed at all. There are several cases in which Maryland appellate courts found unconscionable disparity based on the relative percentage the dependent spouse's income was of the other spouse's income. *See Tracey,* 328 Md. at 393, 614 A.2d at 597 (28 percent); *Caldwell v. Caldwell,* 103 Md.App. 452, 464, 653 A.2d 994, 999 (1995) (43 percent); *Blaine v. Blaine,* 97 Md.App. 689, 708, 632 A.2d 191, 201 (1993), *aff'd on other grounds,* 336 Md. 49, 646 A.2d 413 (1994) (23 percent); *Rock v. Rock,* 86 Md.App. 598, 613, 587 A.2d 1133, 1140 (1991) (20–30 percent); *Broseus v. Broseus,* 82 Md.App. 183, 186, 570 A.2d 874, 880 (1990) (46 percent); *Bricker v. Bricker,* 78 Md.App. 570, 577, 554 A.2d 444, 447 (1989) (35 percent); *Benkin v. Benkin,* 71 Md.App. 191, 199, 524 A.2d 789, 793 (1987) (16 percent); *Zorich v. Zorich,* 63 Md.App. 710, 717, 493 A.2d 1096, 1099 (1985) (20 percent); *Kennedy v. Kennedy,* 55 Md.App. 299, 307, 462 A.2d 1208, 1214 (1983) (33 percent). Although we do not adopt a standard that unconscionable disparity exists based on a particular percentage comparison of gross or net income, the relative percentages in these cases offer some guidance us here in assessing whether the amount of the indefinite alimony award alleviated adequately the unconscionably disparate situation found to exist in the present case. We hasten to note, however, that each case must be evaluated on its facts and not on some fixed minimum or universal standard.

*Turner v. Turner,* 147 Md.App. 350, 809 A.2d 18 (2002), appears to be the only reported Maryland case where the

amount of an indefinite alimony award established by a trial court was reversed for inadequacy. In *Turner*, the Court of Special Appeals found the amount of alimony awarded by the Circuit Court to be insufficient to alleviate the harsh disparity between the parties' incomes and standards of living. The intermediate appellate court based its conclusion on a numerical comparison of the parties' post-divorce, annual incomes. It calculated Mrs. Turner's yearly income, including alimony and imputed earnings, to be approximately $59,000, and calculated Mr. Turner's yearly income, less alimony payments, to be at least $151,000. *Id.* at 392, 400, 809 A.2d at 43, 47. Including alimony, Mrs. Turner's yearly income would have been approximately 35 percent of Mr. Turner's income. The court found the substantial gap in the Turners' incomes and standards of living to be substantial and unconscionable, vacated the award, and remanded the issue to the trial court for reconsideration. We find the analytical approach employed in *Turner* to be persuasive in the present case.

Employing a numerical comparison [16] of the Solomons' yearly incomes, similar to that used in *Turner*, the Court of Special Appeals's majority decision, on this record, is correct. According to a court-ordered employment assessment, Mrs.

---

**16.** Mr. Solomon argues that the Court of Special Appeals' analysis of the income disparity is faulty and incomplete because it failed to consider some of his alleged expenses. These expenses affect the calculation of the Solomons' respective surplus incomes, not the yearly income figure of greatest relevance to this issue. Even considering the respective surplus income analysis, we reach a similar result. The Court of Special Appeals calculated Mr. Solomon's after-tax, monthly income as approximately $50,000. The Court then made the following monthly expense deductions: $5,000 in alimony; $5,874 in child support; $7,000 in payments for the children's tuition, insurances, medical expenses, etc.; $2,937 in living expenses for the parties' son, John; $2,605 in life insurance for the parties' children's benefit; $4,000 in interest on marital debt; $5,000 in principal on marital debt; and $5,655 in personal living expenses. After noting a $1 calculation error by the Court of Special Appeals, Mr. Solomon was left with $11,929 in surplus monthly income. Using the same formula with regard to Mrs. Solomon's situation, the court found her after-tax monthly income to be approximately $5,656; less $5,655 in personal living expenses, Mrs. Solomon's surplus monthly income is $1.00, less than 0.01 percent of Mr. Solomon's monthly surplus income.

Solomon, working to her reasonable potential, could earn approximately $25,000 per year. The combination of her predicted earnings and $60,000 in annual indefinite alimony yields her a yearly income of approximately $85,000. Mr. Solomon has a guaranteed annual salary of $1,050,000. After paying $60,000 in yearly alimony, his yearly income would be $990,000. Mrs. Solomon's annual income, therefore, is approximately 8.5 percent of Mr. Solomon's adjusted income.[17] Compared to the 35 percent differential in *Turner*, the post-divorce disparity of income and standard of living present here is far greater. It is on par with the lowest in the cases identified *supra*.

Mr. Solomon contends that *Turner* involved unique factual circumstances that make it an exceptional case, and that the Court of Special Appeals erred in extending the reasoning in *Turner* to the present case. In *Turner*, the parties were married for more than 30 years and, at the time of divorce, Mrs. Turner was in her fifties. During the Turners' marriage, they worked jointly to create and build a successful and profitable business. Mrs. Turner played a major role in the active development of the business and was involved integrally in its success. Mr. Solomon contends that this factual scenario is very different from that of the present case. By comparison, the Solomons were married for 14 years and, at the time of divorce, Mrs. Solomon was 40 years old. Mrs. Solomon had not played a direct role in making any financial contributions to her family, although she did maintain the household so that Mr. Solomon was free to work and earn a sizable income.

Although we recognize that there are factual differences in the two cases, we nonetheless believe the analysis in *Turner*

---

17. We disregard the child support award in this analysis because both children in Mrs. Solomon's care will reach the age of 18 at the commencement of indefinite alimony. Even assuming that Mrs. Solomon receives pro-rated child support of approximately $35,000 for one of the children up to the nineteenth year, *see* Md.Code (1957, 2001 Repl. Vol., 2003 Cum. Supp.), Art. 1 § 24, that leaves Mrs. Solomon with an annual income of $120,000 or approximately 12.5% of Mr. Solomon's annual income of $955,000.

applies here. In both cases, the trial courts, while recognizing a dramatic gap in the parties' incomes and standards of living, failed to award alimony that was sufficient to remedy the disparity. Although Mrs. Solomon did not play as direct a role in promoting the financial aspects of her marriage as Mrs. Turner did in her marriage, her work in the home no doubt contributed to Mr. Solomon's success in building his professional career. Furthermore, the disparity in incomes in the present case is so much greater than in *Turner* that the raw comparison alone is strong support for questioning the amount of the original indefinite alimony award.

The Circuit Court recognized that, "even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate." Md.Code (1957, 1999 Repl. Vol.), § 11–106(c) of the Family Law Article. The Circuit Court concluded that Mrs. Solomon's situation required more than rehabilitative alimony alone, and awarded her indefinite alimony as well. We conclude that, although the Circuit Court was correct in recognizing an unconscionable disparity between the parties, the indefinite alimony award it provided did not alleviate that disparity adequately.

## IV.

Maryland common law first addressed a husband's dissipation of marital property quite a long time ago. *Feigley v. Feigley*, 7 Md. 537, 561 (1855) (observing that a husband's right to freely alienate property at the expense of supporting his wife is valid, "provided he does so *bona fide*, and with no design of defrauding her of her just claims upon him and his estate."). Dissipation of marital assets, as with many issues in the field of family law, has not been considered much of late by this Court. The majority of modern reported cases developing the doctrine of intentional dissipation of marital assets has been reported by the Court of Special Appeals.

 A trial court's judgment regarding dissipation is a factual one and, therefore, is reviewed under a clearly erroneous standard. "If there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." *Fuge v. Fuge,* 146 Md.App. 142, 180, 806 A.2d 716, 738 (2002); *see also McCleary v. McCleary* 150 Md.App. 448, 462, 822 A.2d 460, 469 (2003).

 In determining a marital award, the trial court first must determine the amount and value of the marital property. Generally, "property disposed of before trial cannot be marital property." *Turner,* 147 Md.App. at 409, 809 A.2d at 52. An exception to the general rule has been recognized when a court "finds that property was intentionally dissipated in order to avoid inclusion of the property towards consideration of a monetary award. . . ." *Sharp v. Sharp,* 58 Md.App. 386, 399, 473 A.2d 499, 505 (1984). Even so, "a conveyance made by a husband before and in anticipation of his wife's suit for alimony, or pending such suit, or after decree has been entered therein in the wife's favor, to prevent her from obtaining alimony, is fraudulent and may be set aside, unless the grantee took in good faith, without notice and for value." *Oles Envelope Corp. v. Oles,* 193 Md. 79, 89, 65 A.2d 899, 903 (1949) (holding spouse's sale of marital property stock for $42,000 over book value adequate consideration to defeat fraudulent dissipation claim). To include property that was disposed of during the marriage, the trial court must be persuaded that there is evidence of dissipation, and "[t]he party alleging dissipation has the initial burden of production and burden of persuasion." *McCleary,* 150 Md.App. at 463, 822 A.2d at 469. If the evidence presented in support of a finding of dissipation is insufficient, the trial court reasonably may conclude that the previously relinquished asset should not be included in the marital property.

 Mrs. Solomon asserts that the Court of Special Appeals and the Circuit Court erred in concluding that Mr. Solomon did not dissipate intentionally his OSI shares from the marital property. Mrs. Solomon argues that the Circuit

Court made its erroneous findings based on its acceptance of conclusory expert testimony that there was no irrefutable evidence found by either expert witness to support her claim of dissipation. We disagree with Mrs. Solomon and hold that the Circuit Court was neither clearly erroneous nor abused its discretion.

At trial, Mrs. Solomon presented evidence, *supra*, of what she contended was Mr. Solomon's dissipation of marital property. Although we recognize that this evidence of Mr. Solomon's dealings regarding his interest in OSI may well have raised suspicions, nonetheless, we agree with the intermediate appellate court that such evidence did not rise to such a level that the trial court was compelled to find that Mr. Solomon acted in a fraudulent or collusive manner. The Court of Special Appeals concluded that, although the exchange of Mr. Solomon's complete interest in OSI in satisfaction of his debt to Mr. Abramowitz's trust seemed unusual (considering the estimated value of that interest), his actions did not constitute dissipation. Given Mr. Solomon's financial position at the time of the pertinent transaction, the uncertainty of OSI's actual worth, and the unpredictability of the outcome of the Mizuho arbitration and litigation, it was not entirely unreasonable for him to forfeit his interest in OSI in order to be free of a substantial debt. The fact that the interest turned out to be worth substantially more than the amount of the debt is unfortunate under the circumstances, but it is not necessarily fraudulent to make a bad business decision.

Although the financial experts investigating this matter testified that they found the circumstances somewhat suspect, neither went so far as to say there was fraud involved. The Circuit Court acted reasonably in finding that the evidence was insufficient to persuade it, let alone compel it, to make a finding of dissipation under all of the circumstances.

## V.

### A.

The final issue is a question of first impression in Maryland's appellate courts. That question is whether a non-

transferrable, non-redeemable, and non-exchangeable country club membership should be considered marital property and, if so, what value does it have. Although we have not decided this specific issue previously, we have addressed other types of property with similar characteristics.

It is well established that the term "property" embodies more than just physical, corporeal assets. It can include intangible entities, such as rights and interests. *See Bouse v. Hutzler,* 180 Md. 682, 686, 26 A.2d 767, 769 (1942) (observing that property, without further qualifications, may include intangible interests). There are certain intangible property interests, however, that are difficult to categorize when determining marital property. For example, this Court has considered the question of whether a professional degree or license constitutes marital property, and concluded that it does not. *Archer v. Archer,* 303 Md. 347, 357, 493 A.2d 1074, 1079 (1985).

The Maryland Marital Property Act defines marital property as "property, however titled, acquired by 1 or both parties during the marriage." Md.Code (1984, 1999 Repl. Vol.), § 8–201(e)(1) of the Family Law Article. We interpret the term "property" as used in the statute as encompassing "everything which has exchangeable value or goes to make up a man's wealth-every interest or estate which the law regards of sufficient value for judicial recognition." *Deering v. Deering,* 292 Md. 115, 125, 437 A.2d 883, 889 (1981) (quoting *Diffendall v. Diffendall,* 239 Md. 32, 36, 209 A.2d 914, 915 (1965)). Property "may reasonably be construed to involve obligations, rights and other intangibles as well as physical things." *Bouse,* 180 Md. at 686, 26 A.2d at 769 (1942).[18]

---

18. Judge Fader notes with approval the following concerning the generally all-encompassing nature of marital property: "[r]emember the definition of 'marital property.' It is *property.* If it is not *property,* it, whatever 'it' may be, cannot be marital property." John F. Fader II & Richard J. Gilbert, *Maryland Family Law,* § 15–11 (3d ed.1990) (citing J. Thomas Oldham, *Divorce, Separation and the Distribution of Property,* Law Journal Seminars Press, (1988)).

An intangible item must have certain characteristics to be considered appropriately marital property. Maryland appellate courts have found several intangible assets to be marital property. *See Queen v. Queen*, 308 Md. 574, 586, 521 A.2d 320, 327 (1987) (holding that a portion of a worker's compensation award for loss of earning capacity during a marriage was marital property); *Deering*, 292 Md. at 125–28, 437 A.2d at 889–90 (holding that any pension rights, contributory or non-contributory, vested or non-vested, constitute marital property); *Green v. Green*, 64 Md.App. 122, 136, 494 A.2d 721, 728 (1985) (holding that "stock option plans, like other benefits in an employee's compensation package, constitute 'property' as used in the definition of marital property").

### B.

Mrs. Solomon contends that the Club membership should be considered marital property and that the Court of Special Appeals erred in concluding otherwise. She also asserts that the Club membership should be valued according to the Club's current initiation fee of $80,000, as was found by the Circuit Court. Mrs. Solomon supports her contentions with a list of cases from other jurisdictions where various types of club memberships were deemed marital property. *See, e.g., In re Marriage of Fink*, 25 Cal.3d 877, 160 Cal.Rptr. 516, 603 P.2d 881, 883 (1979) (country club membership valued at $25,000); *In re Marriage of Dalley*, 232 Mont. 235, 756 P.2d 1131, 1133 (1988) (country club membership valued as marital property but not challenged on appeal); *Putterman v. Putterman*, 113 Nev. 606, 939 P.2d 1047, 1049 (1997) (country club membership included in the martial property but not at issue upon appeal); *McClerin v. McClerin*, 310 S.C. 99, 425 S.E.2d 476, 479 (Ct.App.1993) (country club membership held to be worth the initiation fee at time of trial); *McIntyre v. McIntyre*, 722 S.W.2d 533, 536 (Tex.Ct.App.1986) (country club membership included and valued at the amount of the initiation fee as of the time of trial where member had a returnable interest in his membership fee); *Friedlander v. Friedlander*, 58 Wash.2d 288, 362 P.2d 352, 355 (1961) (listing "Golf Club propriety

membership" as property awarded to respondent valued at $1,100). Mrs. Solomon also argues that a club membership differs from a professional degree or license in that it awards the holder the specific right to use the club's facilities. This right has value distinguishable from the speculative expectancy of future earnings associated with a degree or license. Mrs. Solomon suggests the Club membership is more like a stock option, which gives the holder a *right* to use the Club's facilities, just as a stock option gives the holder a *right* to buy or sell a stock. She characterizes the Club membership as a clear and current right to use and benefit from the Club's facilities, a right someone else would have to pay an $80,000 initiation fee to obtain.

Mr. Solomon agrees with the majority of the Court of Special Appeals's panel that the Club membership is not marital property. He argues that the membership is very similar to a professional degree or license and similarly should be held not to constitute marital property. He also asserts that even if this Court were to conclude that the membership was marital property, it would still lack any monetary value, and, therefore, should not be considered in determining the value of the marital property or the marital award.

## C.

We conclude on this record that the Club membership is not property and therefore not marital property. On this record, the only conclusion that may be reached is that the Club membership cannot be sold, transferred, exchanged, redeemed, inherited, or liquidated in any way. It does not count "to make up" Mr. Solomon's wealth. *See Deering,* 292 Md. at 125, 437 A.2d at 889.

Even under the broader *Bouse* standard, *supra,* for intangible assets, no conceivable method has been advanced for how this intangible asset could be converted into a monetary amount that could be distributed equitably between the parties. It is this inability to sell or divide the Club membership that makes the membership different from the intangible

assets that previously have been held to be marital property. Workers' compensation awards, stock options, and pension rights may be similar to the Club membership in that they may be held only by the original holder and may not be sold or transferred freely to another party. The holders of these assets, however, have the option of exercising or exchanging the assets in order to receive a particular monetary amount, which may then be distributed. It is this characteristic that sets them apart from the Club membership in the present case.

In *Archer*, "a professional degree or license does not possess any of the basic characteristics of property within the ambit of marital property...." 303 Md. at 357, 493 A.2d at 1079. "It is personal to the holder; it cannot be sold, transferred, pledged or inherited. It does not have assignable value nor does it represent a guarantee of receipt of a set monetary amount in the future...." *Id.* at 357, 493 A.2d at 1080. A license or degree only gives the owner a speculative increase in future earnings, which is affected by so many other influences and factors that it hardly can be considered more than a future expectancy. It certainly does not award the holder any guaranteed monetary amount or current specific rights of an ascertainable value, which may be distributed equitably.

This Court's description of the property interests of a degree or license is particularly applicable to the Club membership in the present case. A non-equity club membership lacks the same fundamental characteristics of property that a professional degree or license does, making them both inappropriate for inclusion in marital property. This is not to say that a club membership may never constitute marital property. Those memberships that may be transferred to other parties or can be sold, exchanged, or redeemed for some monetary amount give the holder the ability to convert the membership to an asset with ascertainable value, which could be distributed equitably as marital property. Because Mr. Solomon's non-equity membership does not partake of these abilities, we agree that it does not constitute marital property.

■■■■■■■■

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE DIVIDED EQUALLY BY THE PARTIES.*