**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0922-24

NANCY G. SLUTSKY,

     Plaintiff-Respondent,

v.

KENNETH J. SLUTSKY,

     Defendant-Appellant.

_____

          Argued March 3, 2026 – Decided March 25, 2026

          Before Judges Gilson, Perez Friscia, and Vinci.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-1535-08.

          Scott D. Danaher argued the cause for appellant (Sarno Da Costa D'Aniello Maceri Webb, attorneys; Scott D. Danaher, of counsel and on the briefs).

          Philip A. Greenberg (Philip A. Greenberg, PC) argued the cause for respondent.

PER CURIAM

Defendant Kenneth J. Slutsky appeals from the May 31, 2024 Family Part order valuing his interest in a New Jersey law firm and awarding plaintiff Nancy G. Slutsky fifty percent of the determined value. Defendant also appeals from the November 18, 2024 order requiring him to pay plaintiff $487,041.15 in counsel fees. Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

We limit our recitation of the facts to the issues raised on appeal, as we presume the parties are familiar with the facts and procedural history detailed in our prior opinion affirming in part and reversing in part the trial judge's (first judge) final judgment of divorce and subsequent order entered after a bench trial. See Slutsky v. Slutsky, 451 N.J. Super. 332 (App. Div. 2017).

The parties were married for over thirty years and have three adult children. Defendant graduated from Harvard Law School in 1978 and joined a large New Jersey law firm (the firm), "specializ[ing] in complex tax matters." Id. at 350. In 1984, defendant became an equity partner in the firm. Id. at 351. In 2013, the firm converted from a professional corporation to a limited liability partnership, requiring defendant "to provide a $300,000 capital contribution, financed through a four-year note." Ibid. The firm's compensation committee

A-0922-24

evaluated defendant's performance as an equity partner in relation to the firm's overall performance and thereafter allocated his compensation into a termination credit account (TCA). Ibid.

Plaintiff has an accounting degree from the University of Pennsylvania and a master's degree in finance from New York University. Plaintiff also acquired her certified public accountant license. She was the primary caretaker of the parties' children.

Plaintiff filed a divorce complaint in 2008, and thereafter the "litigation was difficult and protracted." Id. at 343. A central focus of the parties' divorce was the equitable distribution of the marital assets. During the pendency of the divorce action, the parties filed extensive pretrial motions, a party experienced serious health issues, a collateral guardianship matter was litigated, a nineteen-day trial was conducted in 2014, and in August 2017, after the parties appealed, we remanded this matter for further proceedings. Id. at 342.

After the 2014 trial, the first judge issued a final judgment of divorce on May 30, 2014, which was accompanied by a written decision addressing equitable distribution of the parties' marital assets, including defendant's interest in the firm. Id. at 341-42. The first judge also ordered defendant to pay for a portion of plaintiff's attorneys' fees. Id. at 365. After the parties moved to

3

modify the judgment on various grounds, the first judge issued an amended final judgment on July 28, 2014. The first judge also issued a companion order granting plaintiff reconsideration, finding she was also entitled to equitable distribution of defendant's two premarital IRAs and requiring a payment plan.

The parties cross-appealed from the first judge's orders. Id. at 341-42. Defendant disputed the total valuation of his interest in the firm at $1,247,830, which was comprised of a TCA value of $350,830 and a goodwill value of "$1,198,077"[1] less defendant's $300,000 capital contribution. Defendant also challenged plaintiff's equitable distribution award of fifty percent of the valued interest. At trial, plaintiff's expert, Ilan Hirschfeld, C.P.A., and defendant's expert, Thomas J. Hoberman, C.P.A., offered valuation opinions regarding defendant's interest in the firm. The parties disputed the value of defendant's interest in the firm, consisting of the value of his TCA and acquired goodwill, and whether plaintiff was entitled to equitable distribution of any interest.

Relevant to this appeal, we reversed in part the first judge's May 30, 2014 final judgment and subsequent July 28, 2014 order. Specifically, we reversed and remanded for a new judge to address the valuation of defendant's TCA, "the

---

[1] We note there is a numerical discrepancy in the record regarding the goodwill valuation. Because the parties do not raise the issue, we have included the value used in the first judge's order.

4

evaluation of the goodwill attached to defendant's interest in his law firm, as well as [plaintiff's] percentage interest in this asset," the equitable distribution of defendant's IRAs, and "the award of counsel fees" to plaintiff. Id. at 342. We vacated the final judgment provisions that "fix[ed] the value" of the TCA and goodwill "and distribut[ed] defendant's interest in the firm" because there were insufficient factual findings. Id. at 356, 358. We remanded for an "analysis" and factual findings "necessary to resolve the complex question of value" and equitable distribution. Id. at 358. We directed another judge (second judge), to conduct a "valu[ation] of defendant's interest in his firm" and an "analysis [of] . . . plaintiff's interest in the asset" consistent with our opinion. Id. at 364. Because we vacated multiple final judgment provisions and there were lingering questions surrounding the amount of the attorneys' fees, we directed the second judge to reconsider the award of attorneys' fees. Id. at 373.

On May 31, 2024, the second judge issued an order accompanied by a fifty-eight-page written decision addressing the remanded issues after holding a plenary hearing, considering additional submissions, hearing further arguments, and reviewing "3[,]000 pages of transcripts from the nineteen (19) day trial." Regarding defendant's interest in the firm, the second judge conducted a valuation analysis and considered defendant's shareholder and employment

agreements, TCA, pro rata share of the firm's net book value assets, and goodwill interest. The second judge offered the parties an opportunity to provide further "testimony on th[e] issue[s]" but the parties declined.

The second judge separately valued defendant's TCA and goodwill interests in the firm. He used a May 20, 2008 valuation date, which was the date plaintiff filed the divorce complaint. Regarding the TCA after tax value, which was discounted for present value, the second judge considered Hirschfeld's value of $292,908 and Hoberman's value of $285,000. He noted the experts' difference in the TCA value of approximately $7,000 was not large. After reviewing the experts' individual opinions, the second judge determined the appropriate TCA value was $288,954 because both experts had made unsupported assumptions. Specifically, he referenced Hirschfeld's assumption that defendant "would receive a longevity bonus" and Hoberman's TCA assumption that defendant would not "receive any further special allocations on a regular basis." Regarding plaintiff's equitable distribution of the TCA, the second judge found she was entitled to fifty percent, equaling $144,477. The second judge accepted defendant had no cognizable "net book value" in the firm based on the experts' agreement on the issue.

6

After determining defendant's TCA value, the second judge found defendant's goodwill value was $501,547.20.  In addition to acknowledging the legal precedent and factors applicable to the valuation of defendant's interest in the firm, the second judge recognized he was tasked with reviewing defendant's "accumulated . . . individual [goodwill] during his multidecade career at the firm."  He considered defendant's overall reputation related to repeat patronage, "status as an equity partner" that provided him "special allocations" and "share[d] . . . profits," and actual compensation compared to the reasonable compensation of similarly situated attorneys.  The second judge found a "significant[]" excess of actual compensation, which was valued at $896,286 using a five-year review from 2002 to 2007.

The second judge acknowledged that the experts disagreed on defendant's "excess compensation" above the reasonable compensation figure determined for "similarly situated" attorneys.  Hirschfeld's excess value was $221,286, using $896,286 as defendant's actual income and "$675,000 as the reasonable compensation figure."  Hoberman's excess value was $42,000, using $830,000 as defendant's actual income (deducting charges for pension contributions, life insurance, and medical insurance), and "$788,000 as the reasonable compensation figure."

7

The second judge recognized that the experts used Altman Weil data,[2] but determined they had individually adjusted the percentages in reaching opinions on reasonable compensation in ways that were contradicted by the facts and without "any reasonable or adequate explanation." Thus, the second judge was unpersuaded by plaintiff's valuation of defendant's goodwill at $1,185,304 and defendant's valuation of zero. The second judge emphasized that he could not "ignore the incentives at play" and recognized a reasonable compensation analysis was necessary.

The second judge performed a detailed analysis of the Altman Weil's 2008 edition provided data and noted "if [d]efendant was not an equity partner, but he otherwise obtained the same qualifications and worked with the same degree of effort and success, [his] reasonable compensation would have been significantly

---

[2] Altman Weil, Inc., provides "management consulting services to legal organizations" and provides extensive surveys detailing compensation and management trends by legal department. See About Altman Weil, Altman Weil, Inc., https://altmanweil.com/about-altman-weil/ (last visited Mar. 16, 2026). Both parties' experts relied on Altman Weil surveys, which were not provided on appeal.

A-0922-24

lower." The second judge reviewed three separate survey groups,[3] assigning eighty percent to "the Individual Non-Litigation survey group" because the data was most applicable.

The second judge found that "[d]efendant's actual annual compensation [wa]s $896,286," the "annual reasonable compensation [was] . . . $729,103.60," and the resulting "annual excess compensation figure [was] $167,182.40." After considering plaintiff's proposed capitalization rate of eighteen percent,[4] the second judge determined that a capitalization rate of thirty-three percent was more appropriate based on the considered risks. The second judge emphasized the consideration of defendant's "life expectancy, the limits on [d]efendant's ability to sell his interest in the firm, the risk profile of the firm, and other relevant factors." It was noted that in 2014, when the first judge issued his decision, defendant was approximately sixty years old and, in May 2024, defendant was approximately seventy years old and still an equity partner working at the firm. The capitalization rate of thirty-three percent applied to the

---

[3] The Survey groups used were "attorneys practicing in New Jersey" admitted to the bar in between 1979 and 1983, "equity partners working in law firms with over 150 lawyers," and non-litigation attorneys (equity and non-equity partners) "that specialize in tax law."

[4] Defendant did not propose a capitalization rate as he argued there was no applicable excess compensation amount.

$167,182.40 excess compensation value resulted in a "total value of [d]efendant's goodwill [of] $501,547.20." The second judge recognized that defendant's work-life expectancy suggested a "higher capitalization factor," but, in evaluating the other factors, was convinced the capitalization rate was fairly supported.

Regarding equitable distribution, the second judge considered the factors enumerated under N.J.S.A. 2A:34-23.1. He found it relevant that the parties were married for over thirty years, plaintiff was fifty-two years old when the divorce complaint was filed, and she had suffered cancer, diabetes, arthritis, and a broken back. Defendant was fifty-five years old when the complaint was filed and had generally good health, except for experiencing migraines. The parties had each contributed $30,000 at the start of the marriage to purchase a home and together accumulated the marital estate. The second judge determined the parties "lived a lavish lifestyle," including memberships in clubs, vacationing, buying a home for $1.75 million and spending approximately $1 million on renovations. The parties' annual expenses exceeded defendant's after-tax earnings, and they benefited from his "family trusts." Plaintiff was the children's primary caretaker but had hired assistance throughout the years. The second judge found plaintiff was not gainfully employed due to her health issues and

10

was "almost entirely [financially] dependent on [d]efendant." The second judge noted plaintiff had accumulated approximately $2,627,230 in debt from 2002 to 2007. Relating to litigation fees incurred, the second judge determined plaintiff owed $1,751,655.93.

The second judge reasoned defendant's income and specialized knowledge of "complex tax law and estate planning" was exceptional. Defendant had contributed to his children's upbringing through his earnings and caring for their welfare. The second judge noted plaintiff had taken on the responsibility to raise the children, defendant was candid in acknowledging he had also "run[] up the tab" of debt, and defendant enabled plaintiff to amass credit card debt.

After determining defendant's TCA value was $288,954, his goodwill value was $501,547.20, and the total value was $790,501.20, the second judge found plaintiff was entitled to fifty percent of the total value after weighing the equitable distribution factors. Accordingly, the second judge ordered that plaintiff was entitled to $395,250.60 in equitable distribution.

The second judge next addressed whether defendant should be ordered to pay a portion of plaintiff's attorneys' fees. On remand, we had directed the second judge to address plaintiff's attorneys' fees. Id. at 368. We specifically stated that "[t]he provision ordering defendant to pay plaintiff's fees is vacated"

11

and the issue of attorneys' fees was to be addressed because we had "altered" the results obtained and the first judge had failed to consider plaintiff's actions throughout the litigation. The first judge had originally ordered defendant to pay $467,793.38 of plaintiff's attorneys' fees and costs.[5] Based on the record, we discerned it was unclear whether plaintiff actually owed "more than '$1.7 million'" in fees. Id. at 367. We directed the second judge to consider the actual amount of plaintiff's attorneys' fees owed, defendant's ability to pay, and plaintiff's actions in incurring the attorneys' fees. We specifically stated "each . . . issue[] must be reviewed on remand." Id. at 373. We did not limit the second judge's consideration of relevant evidence on the issue of attorneys' fees.

The second judge, at the May 4, 2023 hearing, advised the parties that he would address the remanded attorneys' fees issue based on the submissions and "did[ not] need any additional testimony on that issue." The parties neither objected nor requested to provide testimony as to the reasonableness of the fees.

The second judge weighed the parties' financial circumstances and ability to pay. He found plaintiff received "$260,000 per year in permanent alimony," netting approximately "$175,000 after taxes," and had a wage garnishment

_____

[5] We note the first judge's opinion found plaintiff had incurred total fees and costs of $1,751,655.93, which included plaintiff's expert fees totaling $241,817.68.

against her for approximately $32,500 a year. While the second judge questioned plaintiff's annual expenses, he found she did not have "available income." Regarding defendant's ability to pay and available income, the second judge noted defendant's income from the firm was reduced "by at least $260,000 per year" based on alimony and other required expenses. Nevertheless, the second judge found defendant had a "substantial and well-established" earning capacity while plaintiff was actively unemployed given her age and health issues.

Regarding plaintiff's conduct, the second judge determined she was often "counterproductive and [advanced] unreasonable" positions. He noted plaintiff's behavior on remand was consistent with her behavior during the first trial, which was described as disruptive, belligerent, confrontational, and erratic. The second judge noted defendant had also caused the parties to incur greater counsel fees through his actions, referencing defendant's unsuccessful pursuit of moving to declare plaintiff incompetent, which resulted in her incurring $87,014.24 in guardianship defense fees. Specifically, defendant had asserted there was a "necessity to appoint a guardian ad litem for plaintiff[,]" which resulted in "a different judge conduct[ing] a trial and conclud[ing] plaintiff was

competent." Id. at 349. The second judge found defendant had mostly acted in "good faith."

Further, the second judge noted there were over eighty-two pre-judgment orders entered. "Plaintiff was found in violation of litigant's rights at least five . . . times." The second judge compared plaintiff's attorneys' fees of $1,509,838.25 to defendant's attorneys' fees of $757,823.77. Regarding three pre-trial attorneys' fees awards, the second judge noted defendant had a partial credit of $11,242.50. Additionally, defendant was entitled to a $30,000 credit for advancing fundings "for post-remand litigation costs." These credits were applied against plaintiff's attorneys' fees award. Finding it would be unfair to require defendant to pay fifty percent of plaintiff's attorneys' fees, the second judge ordered defendant to only pay thirty-five percent. In sum, defendant was ordered to pay $487,041.15 of plaintiff's $1,509,838.25 in fees, less the credits owed of $41,402.24.

Both parties thereafter moved for reconsideration. Defendant moved to reconsider the determination of his interest in the firm, the award of counsel fees, and for other various relief. At oral argument, defendant argued the second judge committed a mathematical error and improperly averaged the experts' opinions to arrive at the TCA value. He further asserted there was no goodwill

14

A-0922-24

value, and, alternatively, the court should have applied a forty percent tax effect to the goodwill. Regarding counsel fees, defendant argued a plenary hearing was required pursuant to Mayer v. Mayer, 180 N.J. Super. 165 (App. Div. 1981). The second judge entered an amended order on November 18, 2024. Relevant to this appeal, the second judge denied defendant's request for reconsideration of his interest in the firm and found "[d]efendant agreed to waive a hearing" on the issue of attorneys' fees. Plaintiff's requested reconsideration relief was also denied.

On appeal, defendant argues reversal is warranted because the second judge erred by: (1) incorrectly valuing defendant's interest in the firm, including valuing his TCA at $288,954 and goodwill at $501,547.20; (2) awarding plaintiff fifty percent of defendant's interest in the firm; and (3) compelling defendant to pay $487,041.15 in attorneys' fees.

II.

"We accord deference to Family Part judges due to their 'special jurisdiction and expertise in family [law] matters.'" Gormley v. Gormley, 462 N.J. Super. 433, 442 (App. Div. 2019) (alteration in original) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). Our scope of review of Family Part orders is limited. Cesare, 154 N.J. at 411. A trial judge's "findings are binding on

appeal so long as their determinations are 'supported by adequate, substantial, credible evidence.'" Gormley, 462 N.J. Super. at 442 (quoting Cesare, 154 N.J. at 411-12). However, while "a family court's factual findings are entitled to considerable deference, we do not pay special deference to its interpretation of the law." Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016) (quoting D.W. v. R.W., 212 N.J. 232, 245 (2012)).

Further, our review of equitable distribution determinations is narrow. Valentino v. Valentino, 309 N.J. Super. 334, 339 (App. Div. 1998) (citing Wadlow v. Wadlow, 200 N.J. Super. 372, 377 (App. Div. 1985)). Family Part judges have broad discretion to allocate assets subject to equitable distribution. Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012).

Our Supreme Court, in Stern v. Stern, considered a spouse's "entire worth of . . . [a] partnership interest" "in a very successful, well-known and highly respected law firm." 66 N.J. 340, 344, 347 (1975). The Court stated:

> Generally speaking[,] the monetary worth of this type of professional partnership will consist of the total value of the partners' capital accounts, accounts receivable, the value of work in progress, any appreciation in the true worth of tangible personalty over and above book value, together with good[]will, should there in fact be any; the total so arrived at to be diminished by the amount of accounts payable as well as any other liabilities not reflected on the partnership books. Once it is established that the books of the firm

16

are well kept and that the value of partners' interests are in fact periodically and carefully reviewed, then the presumption to which we have referred should be subject to effective attack only upon the submission of clear and convincing proofs.

[Id. at 346-47.]

Goodwill is not a tangible asset but "is 'essentially [a] reputation that will probably generate future business'" and "encompasses the 'advantages of an established business that contribute to its profitability,' such as a good name, capable staff, and a reputation for superior services." Slutsky, 451 N.J. Super. at 359-60 (quoting Dugan v. Dugan, 92 N.J. 423, 431 (1983)). Further, "'[g]oodwill can be translated into prospective earnings.'" Ibid. (alteration in original) (quoting Dugan, 92 N.J. at 431).

The Supreme Court in Dugan recognized that:

After divorce, the law practice will continue to benefit from that goodwill as it had during the marriage. Much of the economic value produced during an attorney's marriage will inhere in the goodwill of the law practice. It would be inequitable to ignore the contribution of the non-attorney spouse to the development of that economic resource. An individual practitioner's inability to sell a law practice does not eliminate existence of goodwill and its value as an asset to be considered in equitable distribution. Obviously, equitable distribution does not require conveyance or transfer of any particular asset. The other spouse, in this case the wife, is entitled to have that asset

17

considered as any other property acquired during the marriage partnership.

[92 N.J. at 434.]

The application of an accepted goodwill valuation methodology is "accomplished by fixing the amount by which the attorney's earnings exceed that which would have been earned as an employee by a person with similar qualifications of education, experience[,] and capability." Ibid. The "actual average" is determined using the compensation "before federal and state income taxes." Id. at 439. "If the attorney's actual average realistically exceeds the total of (1) the employee norm and (2) a return on the investment in the physical assets, the excess would be the basis for evaluating goodwill." Id. at 439-40. The Supreme Court further stated:

> The excess is subject to a capitalization factor [which is] the number of years of excess earnings a purchaser would be willing to pay for in advance in order to acquire the goodwill. The precise capitalization factor would depend on [a variety of factors including] [t]he age of a lawyer . . . because . . . goodwill would probably terminate upon death. . . . Subject to such adjustments, . . . a figure close to the true worth of the law practice's goodwill may be obtained.
>
> [Id. at 439-440.]

"In every case . . . the court shall make specific findings of fact on the evidence relevant to all issues pertaining to asset eligibility or ineligibility, asset

valuation, and equitable distribution . . . ." N.J.S.A. 2A:34-23.1. Further, there is "a rebuttable presumption that each party made a substantial financial or nonfinancial contribution to the acquisition of income and property while the party was married." N.J.S.A. 2A:34-23.1. "[T]he goal of equitable distribution . . . is to effect a fair and just division of marital assets." Steneken v. Steneken, 183 N.J. 290, 299 (2005) (quoting Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004)).

The Legislature enumerated the following sixteen factors a trial judge should consider in determining an equitable distribution of property award:

a. The duration of the marriage or civil union;

b. The age and physical and emotional health of the parties;

c. The income or property brought to the marriage or civil union by each party;

d. The standard of living established during the marriage or civil union;

e. Any written agreement made by the parties before or during the marriage or civil union concerning an arrangement of property distribution;

f. The economic circumstances of each party at the time the division of property becomes effective;

g. The income and earning capacity of each party, including educational background, training,

employment skills, work experience, length of absence from the job market, custodial responsibilities for children, and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage or civil union;

h. The contribution by each party to the education, training[,] or earning power of the other;

i. The contribution of each party to the acquisition, dissipation, preservation, depreciation[,] or appreciation in the amount or value of the marital property, or the property acquired during the civil union as well as the contribution of a party as a homemaker;

j. The tax consequences of the proposed distribution to each party;

k. The present value of the property;

l. The need of a parent who has physical custody of a child to own or occupy the marital residence or residence shared by the partners in a civil union couple and to use or own the household effects;

m. The debts and liabilities of the parties;

n. The need for creation, now or in the future, of a trust fund to secure reasonably foreseeable medical or educational costs for a spouse, partner in a civil union couple[,] or children;

o. The extent to which a party deferred achieving their career goals; and

p. Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23.1.]

The equitable distribution statute "reflects a public policy that is 'at least in part an acknowledgment "that marriage is a shared enterprise, a joint undertaking, that in many ways . . . is akin to a partnership."'" Thieme, 227 N.J. at 284 (quoting Smith v. Smith, 72 N.J. 350, 361 (1977)).

III.

Defendant first argues the second judge erred in valuing his TCA. Defendant acknowledges that the experts' TCA valuations were within "a few thousand dollars of each other" and argues the second judge "simply averag[ed] the values of plaintiff's and defendant's respective experts' [opinions]." Specifically, defendant posits the second judge performed "no analysis," "fail[ed] to meticulously analyze the experts' values," and should have discounted "plaintiff's expert's value after identifying an error with respect to the expert's methodology." After a review of the second judge's decision, we disagree.

The second judge correctly conducted a valuation analysis considering defendant's shareholder and employment agreements with the firm, the historic value of his TCA, and separately considered "any goodwill interest [d]efendant has as an equity partner that is unaccounted for by the TCA." (emphasis added).

21

The second judge noted the experts somewhat closely agreed on defendant's TCA value. He found plaintiff's expert opined the value was $292,908 and defendant's expert opined the value was $285,000.

After addressing the experts' "methods of calculation," the second judge contemplated the "assumptions made by each party." The second judge credited assumptions in Hirschfeld's report highlighting that it was assumed defendant "would continue to be compensated under the TCA system until age seventy," which, based on the passage of time, had proven to be true. He also noted that, at the time of the Hirschfeld's report, defendant's receipt of a "conditional longevity bonus" was not "guaranteed" because it vested only post-divorce, in 2013. We note defendant was eligible for the longevity bonus after working at the firm for thirty years. The second judge found no support for Hoberman's opinion that there would be no "further special allocations on a regular basis." After finding each expert had partially based their opinions on unsubstantiated positions, the second judge found, after weighing the particular assertions, that the incorrect assumptions were in equipoise and splitting the $7,000 differential was fair based on the facts presented before him. "A trial court is free to accept or reject the testimony of either side's expert[] and need not adopt the opinion of either expert in its entirety." Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002). We

22

discern no abuse of discretion in the second judge's determination because it was based on a review of each expert's valuation.

Defendant next contends the second judge erred in finding defendant had goodwill interest as an equity partner at the firm. He posits there exists zero goodwill, despite the fact that he has been a long-term member of the firm and undisputedly has garnered an actual income above comparable, reasonable compensation amounts. Alternatively, defendant argues the second judge incorrectly calculated goodwill because he did not determine a tax effect. We disagree with defendant's assertions that his total interest is accounted for in the TCA and goodwill was calculated incorrectly.

After the second judge reviewed the experts' opinions and their methodologies, against the applicable law, he determined defendant's goodwill value was $501,547. Observing that Hirschfeld used $896,286 as defendant's actual income and Hoberman used $830,000 as defendant's actual income, and after deducting certain contributions, the second judge then examined how each expert arrived at a reasonable compensation figure for similarly situated attorneys. He was unpersuaded by plaintiff's inflated value. Further, the second judge also found no support for defendant's argument that "there is no goodwill value outside of what is already accounted for by the TCA" as the value of the firm "interest and

23

the value of the TCA [were] one in the same." The second judge relied extensively on the methodology and capitalization factor used in <u>Dugan</u>. The record supports the second judge's finding that neither expert's goodwill opinion was wholly accurate because they were premised on selected favorable data for each party's position.

After a review of the relevant factors, the second judge accurately found defendant had a goodwill interest because the TCA did not account for the entirety of the fair value of defendant's interest in the firm. He provided sufficient analysis and reasons, based on the record, for determining defendant's annual compensation was $896,286 and a similarly situated attorney's reasonable compensation was $729,103.60. Regarding the reasonable compensation rate, the second judge performed a detailed evaluation of three separate survey groups, attributing the most weight to the practice-specific survey group. We, therefore, discern no error in the second judge's determination that the "annual excess compensation figure" was $167,182.40.

The second judge relied on <u>Dugan</u> in calculating the excess compensation figure before tax effect and applying the capitalization factor, specifically quoting the instruction that the value should be calculated "before federal and state income

taxes."[6]  See 92 N.J. at 439.  After finding the excess compensation figure, the second judge then considered defendant's inability to sell his interest, work-life expectancy, and other risk factors.  The second judge then fairly applied a thirty-three percent capitalization factor—setting defendant's goodwill value at $501,547.20.

Based on the record in this matter, we are unpersuaded by defendant's argument that he possessed zero goodwill because he could not "sell any purported goodwill," and that any goodwill possessed by the firm was not shared with him. This fails to consider the other applied factors.  His inability to receive "a departing member . . . [compensation] amount" above the TCA is only one factor that is measured against his higher compensation and work-life expectancy at the firm. Contrary to defendant's assertions, the second judge relied on clear and convincing

---

[6] We note defendant argued in his motion for reconsideration that a forty percent tax effect should be applied to the goodwill value.  During the reconsideration argument, the second judge noted no supporting authority was cited.  On appeal, defendant again offers no authority to contradict the established standard not to apply a speculative tax effect on value.  See Dugan, 92 N.J. at 439; Stern, 66 N.J. at 348 ("The fact that [defendant may] pay a tax on these receipts may be a relevant consideration when considering . . . equitable [distribution] . . . , but it does not affect the value of defendant's interest in the law firm."); Orgler v. Orgler, 237 N.J. Super. 342, 355 (App. Div. 1989) ("[The] deduction of hypothetical taxes from present value frustrates the trial court's basic function to assure [equitable disposition].").

evidence and accepted methodology in determining defendant's goodwill value. We discern no abuse of discretion.

We next turn to consider defendant's argument that the second judge erroneously awarded plaintiff fifty percent of his valued interest in the firm. Defendant again argues he is unlike a business owner because he cannot "sell his" interest in the firm and realize a value. This contention discounts his ongoing income stream that was established to be greater than the average compensation for similarly situated attorneys. Defendant posits it was "inequitable" to award plaintiff fifty percent because she "received all of the benefit and none of the risk . . . realizing such value over the course of defendant's remaining working years." This position also ignores plaintiff's contributions made during the parties' marriage over thirty years, and the extensive, relevant factors considered by the second judge.

After determining defendant's interest in the firm, the second judge found plaintiff was entitled to fifty percent in equitable distribution, awarding $395,250.60. The second judge's fifty percent determination was done in a manner consistent with the equitable distribution statute. He provided a detailed explanation of the relevant applicable factors and carefully weighed each factor. We, therefore, discern no abuse of discretion in the second judge's award.

26

Finally, we address defendant's argument that the second judge "egregiously abused his discretion" in ordering defendant to reimburse plaintiff for $487,041.15 in attorneys' fees, which represented thirty-five percent of her total attorneys' fees incurred. Specifically, defendant argues the second judge erred by expanding the scope of our remand, which he posits had reversed only the first judge's award of "$467,793.38 in counsel fees . . . for Donahue Hagan." Stated another way, defendant argues our "remand only pertained to the counsel fees [plaintiff] incurred with one of her prior attorneys" as the first judge had "specifically denied [her] request for defendant to contribute toward the counsel fees for her other attorneys." Defendant alternatively argues that, if the second judge appropriately considered plaintiff's total amount of attorneys' fees, then reversal is warranted because he "failed to appropriately analyze . . . the relevant factors, including . . . the reasonableness of the fees" and plaintiff's bad faith.

Defendant's argument that we limited the second judge's review of attorneys' fees on remand is misplaced. We clearly "determine[d] certain findings [made by the first judge regarding attorneys' fees] were mistaken, and the need for additional review require[d] reversal." Slutsky, 451 N.J. Super. at 365. Notably, defendant had moved to file supplemental briefing in the prior appeal related "to the amount of plaintiff's counsel fee obligation," which we granted. Id. at 352. We observed

the first judge "considered the amount of fees plaintiff incurred, . . . as more than '$1.7 million.'" Id. at 367. We vacated the provision ordering defendant to pay plaintiff's fees and determined a review of the award of plaintiff's attorneys' fees was warranted because the "results obtained by plaintiff ha[d] now been altered on appeal." Ibid. Thus, the second judge correctly addressed the issue of attorneys' fees anew.

We also reject defendant's argument that "the [second] judge ignored that defendant had never been afforded an opportunity to challenge the fees of the other attorneys." This assertion is belied by the record. At the May 2023 testimonial hearing, the second judge advised the parties he would address the remanded issue of attorneys' fees based on the submissions and "did[ not] need any additional testimony on that issue." Neither party objected nor requested a hearing to dispute the reasonableness of the fees billed. Additionally, defendant apparently never filed a motion to supplement the record on the issues of attorneys' fees. Thus, we discern the second judge committed no error in not having a hearing for defendant to challenge plaintiff's attorneys' fees.

After a review of the second judge's detailed written decision, we are also unpersuaded by defendant's argument that the second judge failed to consider and analyze the relevant factors in awarding plaintiff $487,041.15 in attorneys'

28

fees. The second judge reviewed the amount of fees plaintiff owed, each party's ability to pay, and their conduct throughout the litigation. While plaintiff's conduct was found to be at times "unjustifiable" and improper, defendant was also found to have "pursued [a] course of action that increased the parties' [attorneys'] fees." The second judge found defendant had superior financial circumstances and a greater ability to pay but it would be "unfair to compel [d]efendant to pay for the majority or . . . fifty percent of" plaintiff's attorneys' fees. In considering the relevant factors, he reasoned that ordering defendant to pay approximately thirty-five percent was supported because it would conversely be unfair to "require [p]laintiff to bear the burden of . . . the entirety of her [attorneys'] fees." Because the record sufficiently supports the second judge's decision, we discern no abuse of discretion.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

29                                                                                    A-0922-24